**40**

Jesse **RODRIGUEZ,** Sadrach G. Perez and Modesto Herrera, on their own behalf and on behalf of those similarly situated, Plaintiffs-Appellants,

v.

**EAST TEXAS MOTOR FREIGHT,** Southern Conference of Teamsters and Teamsters Local 657, Defendants-Appellees.

No. 73–2801.

United States Court of Appeals, Fifth Circuit.

Nov. 25, 1974.

Mario Obledo, Sanford Rosen, Mexican-Amer. Legal Defense & Educational Fund, Inc., San Francisco, Cal., Ed Idar, Jr., Jim Heidelberg, MALDEF, San Antonio, Tex., for plaintiffs-appellants.

Debra Millenson, EEOC, Washington, D. C., amicus curiae.

Theo. F. Weiss, San Antonio, Tex., Richard C. Hotvedt, Harry A. Rissetto, Washington, D. C., George E. Seay, William C. Strock, Dallas, Tex., for East Texas Motor Freight.

Edward W. Penshorn, Bradford F. Miller, San Antonio, Tex., for Teamsters Local Union 657.

G. Wm. Baab, L. N. D. Wells, Jr., Hal Gillespie, Dallas, Tex., for Southern Conference of Teamsters.

Before WISDOM, AINSWORTH and GODBOLD, Circuit Judges.

WISDOM, Circuit Judge:

In this employment discrimination case the plaintiffs-appellants attack two ubiquitous practices in the trucking industry: (1) the trucking companies' requirement that "city drivers" resign from their city driver jobs before applying for the more lucrative and sought-after "road" or "line driver" * positions, and (2) the companies' rule preventing city drivers from carrying their seniority to road driver jobs. The plaintiffs, Mexican-American city drivers for East Texas Motor Freight (ETMF), brought this action below as a class action, contending that these facially neutral practices of ETMF and the defendant union organizations perpetuate the effects of past discriminatory hiring practices and thus violate Title VII of the Civil Rights Act of 1964 [1] and 42 U.S.C. § 1981.[2]

---

* The terms "road driver" and "line driver" are used interchangeably throughout this opinion.

1. (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

 . . . . .

(c) It shall be an unlawful employment practice for a labor organization—
 (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
 (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
 (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.
42 U.S.C. § 2000e-2.

2. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by

The district court found that the cause of action was inappropriate for a class action, and that none of the defendants had violated Title VII or Section 1981. We reverse.

## I.

### Facts

In the trucking industry, "road" or "line driver" is considered a separate job classification from "city, pick-up and delivery driver". Road drivers for ETMF drive 10-speed tractors with semi-trailers, carrying freight among the 52 ETMF terminals in 19 states. Road drivers work long hours, and often spend long periods of time away from home, but they have the prestige driving job in the trucking industry, and they generally bring home the highest pay. Freight brought to a terminal by a road driver is unloaded and reloaded onto other trucks, either onto another tractor-trailer, or onto a "bobtail", a truck with the body and engine mounted on the same chassis. A city driver then delivers the merchandise locally.

In conformance with the practice in the trucking industry generally, ETMF "domiciles" road drivers at only some of its terminals: those in cities that are relay points equidistant between major centers, and those in "head haul" cities, cities at the end of a line of service that generate a significant amount of freight to other points in the company's system. In Texas ETMF has six terminals that domicile road drivers, and fifteen terminals that do not.[3] ETMF has city drivers at all terminals.

The primary responsibility for hiring drivers, both city and road, in the ETMF system rests with the manager at the terminal where a vacancy occurs. The manager interviews applicants, reviews their qualifications, and makes recommendations to officials at the corporate headquarters in Dallas. Although the Dallas officials must approve each applicant for employment, the terminal manager makes the affirmative decision to hire. The unions have no responsibility for hiring.

ETMF's qualifications for road drivers are more stringent than for city drivers. City drivers must be at least 21 years old and have at least one year pick-up and delivery experience. Road drivers must be at least 27 years old and have three years "immediate prior line haul road experience". Both city and road drivers face a battery of other requirements involving driving, work, credit, and police records. They must be familiar with Department of Transportation regulations, have a high school education or the equivalent, and hold a valid commercial drivers license. Finally, both city and road drivers must pass physical, written, and driving examinations. Everett E. Cloer, ETMF's Vice President in charge of industrial relations testified to the importance of driving tests for road drivers: "Well, first of all [applicants] are given a 25-mile driving test within the city to see if they can handle the transmissions of this equipment, see what their driving reactions are, et cetera. If they pass that, then they are given an in-cab trip with the supervisor. The supervisor rides with them on a student [over-the-road] trip."[4] Counsel for the parties

---

white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

3. Those terminals domiciling road drivers are: Dallas, El Paso, Longview, Pecos, San Angelo, and Texarkana. Only city drivers are domiciled at the following terminals: Abilene, Amarillo, Atlanta, Austin, Beaumont, Brownwood, Ft. Worth, Henderson,

Houston, Lubbock, Lufkin, Marshall, Odessa, San Antonio, and Tyler.

4. The importance of road testing as a criterion for hiring road drivers was echoed by Ed A. Asbury, Manager of ETMF's San Antonio terminal. When asked how he would determine whether city drivers were qualified to be road drivers, he answered: "I think I should have to ride with those boys to be able to answer that question. I don't know . . . I would have to—if I were

stipulated that the line driver requirements are nondiscriminatory.

City drivers and road drivers are covered by different collective bargaining agreements. The defendant-appellee Local 657 has a collective bargaining agreement with ETMF covering city drivers at ETMF's San Antonio terminal. Local 657 represents no road drivers of ETMF. The defendant-appellee Southern Conference of Teamsters, a delegate body of the International Brotherhood of Teamsters, Chauffeurs and Warehousemen and Helpers of America, is made up of representatives from the affiliated Locals in ten southern states. Separate collective bargaining agreements for city and road drivers are drawn by the Southern Conference and negotiated by the Conference with trucking company representatives. Then the agreements are passed down to the Locals to be approved and made part of the contracts between the Locals and the trucking companies.

Since 1954 ETMF has followed a "no-transfer" policy, prohibiting the transfer of drivers between city and road driver classifications and between terminals.[5] Under the policy, in order for a city driver to obtain a position as a road driver, he must resign his city driver job and apply for a road driver slot. He thereby forfeits all accumulated seniority. In effect, he stands on no better footing in applying for a road driver job than a complete stranger to the company. For the purposes of strengthening his application, he gains no "credit" for his years as a city driver. And if his bid to be a line driver fails, there is no guarantee that he will be rehired as a city driver. ETMF's policy against transfers is complemented by the fact that under collective bargaining contracts between ETMF and Local unions, including the defendant Local 657, city drivers who transfer to the road do not carry over their "competitive-status" seniority, that is, seniority for job bidding and lay off purposes.[6] Under separate collective bargaining agreements for road and city drivers, competitive-status seniority runs from the time an employee enters a particular collective bargaining unit. Transfer is not expressly prohibited, but it is not expressly permitted either, and the agreements have been universally interpreted to prohibit the carryover of seniority from one classification to another.

For thirty days in January and February 1972, to ease morale problems among its city drivers who wanted to become road drivers, ETMF relaxed its no-transfer policy and permitted city drivers to transfer to line jobs, if they could qualify.[7] During this period, although all other requirements were maintained, the requirement of three years line driving experience was waived. The modification did not affect the dual seniority system established by the separate collective bargaining agreements. Any city driver transferring to the road under the modified policy still lost his seniority for job bidding and lay off purposes. Moreover, the one-time-only change in policy opened the possibility of transfer only to those city drivers who worked out of terminals domiciling road drivers; the restrictions on interterminal transfers remained in effect. In the Southern Conference area 220 city drivers showed an interest in transferring under the temporary policy, and 35 to 50 city drivers tried out; five

going to make an honest appraisal, I would get out and ride with that man. I would ride with him here in town, and I would ride with him on the freeway. I would ride with him in line haul equipment. I would see what he would do, how he conducted himself, how he handled his equipment."

5. Road drivers for ETMF presently operate under a "modified" terminal no-transfer pol-

icy. If a road driver at one terminal is laid off, he can "bump" a less-senior road driver at another terminal.

6. The employee keeps his company seniority for fringe benefit purposes.

7. Road drivers were also permitted to transfer to the city.

succeeded in transferring to road driver jobs.[8]

Against the history of these policies must be juxtaposed one crucial set of facts. The parties stipulated that before 1970 East Texas Motor Freight had never employed a black or Mexican-American as a road driver in the Texas-Southern Conference area.[9] ETMF's road driver force in that area numbered approximately 180, all white/anglo drivers. After charges were filed by plaintiff Jesse Rodriguez with the Equal Employment Opportunity Commission (EEOC) on August 20, 1970, the company hired three Mexican-American road drivers in El Paso. By the time of trial, the company had still not hired a single black road driver in Texas. In comparison, approximately 35 percent of ETMF's city drivers in Texas are black or Mexican-American. Of a total of 575 city drivers for ETMF in the state, 111 are Spanish-surnamed, 95 are black, and 369 are anglo.

The three named plaintiffs, Jesse Rodriguez, Sadrach Perez, and Modesto Herrera, are Mexican-American city drivers at ETMF's San Antonio terminal. With the exception of one road driver who temporarily worked out of San Antonio in 1970, ETMF road drivers have never been domiciled in San Antonio. San Antonio city drivers were therefore not able to take advantage of the temporary modification of the no-transfer rule in the winter of 1972. Perez was hired as a city driver in 1959, Herrera was hired in 1964, and Rodriguez was hired in 1965. They stipulated that they were employed at the San Antonio Terminal without regard to race, color, or national origin. Each is a member of Local 657 and the Southern Conference.

Although none of the named plaintiffs made written application for a line driver job until 1970, Herrera made verbal inquiries about transferring to the road as early as 1965. In 1970 the plaintiffs submitted letters to the San Antonio terminal manager, requesting transfer to road driving jobs. The terminal manager received and filed the letters. ETMF stipulated that it never considered these applications for employment as road drivers. On August 20, 1970, Rodriguez filed a written charge with the EEOC complaining that the policies of ETMF, Local 657, and the Southern Conference relegated Mexican-Americans and blacks to city driver jobs. Similar charges were filed by Herrera on March 11, 1971, and by Perez on June 7, 1971. On May 18, 1971, Perez was discharged from his employment with ETMF. The plaintiffs received thirty-day "right-to-sue" letters on October 11 and 13, 1971. On October 26, 1971, the plaintiffs filed this class action suit in district court.

Prior to the trial in this cause, the parties entered into a series of stipulations. In addition to the stipulations already mentioned, the parties agreed to the following:

The claim of discrimination of the Plaintiffs is solely based upon the fact that after their original employment, they have been "locked in" to the lower paying job of city driver and denied a job as line driver because of:

(a) The maintenance of separate seniority rosters for city and line drivers;

(b) The fact that any city driver regardless of his race, if he transferred from city driver classification to a road driver classification, loses his accumulated city seniority;

(c) The Defendant East Texas Motor Freight discouraged inquiries from Plaintiffs concerning the qualifications and/or availability of line driving jobs;

(d) The fact that the Defendant East Texas Motor Freight had always employed Anglo/white applicants as road drivers;

8. All five of the city drivers to make successful transition to road driver jobs worked out of the Memphis, Tennessee, terminal.

9. The Southern Conference covers all Teamster members in Texas, except for some in El Paso.

(e) That the company's policy and practice of recruiting line or road drivers has been based to a great extent on a word of mouth system. Since the company's line drivers and supervisory terminal personnel are almost exclusively Anglo/white, such a practice has continued the alleged illegal exclusion of Mexican-Americans and Negroes as road drivers;

That the only issue presently before the Court pertaining to the company is whether the failure of the Defendant East Texas Motor Freight to consider Plaintiffs' line driver applications constituted a violation of Title VII and 42 U.S.C. § 1981.

Over strenuous objection at trial, the district court admitted evidence relating to the qualifications of the named plaintiffs to be road drivers. After trial, the court concluded that none of the named plaintiffs could satisfy all of the road driver requirements "according to the company manual due to age or weight or driving record". Furthermore, the court found, "[t]he driving, work, and/or physical records of the plaintiffs are of such nature that only casual consideration need be given to determine that the plaintiffs cannot qualify to become road drivers". In conclusion, the court found that "[t]he defendants did not discriminate against the plaintiffs or any other employee or union member on the basis of race or otherwise". The plaintiffs appeal. The Equal Employment Opportunity Commission, as amicus curiae, has filed a brief urging reversal of the decision of the district court.

## II.

### The Class Action Claim

The plaintiffs brought this suit "on their own behalf and on behalf of other Mexican-American and black individuals who similarly have been denied equal employment opportunities by the defendants and additionally on behalf of Mexican-American and black individuals who may, in the future, be denied equal employment opportunities by the defendants because of their national origin and race". They described the class more particularly as "all of defendant East Texas Motor Freight's Mexican-American and black in-city drivers included in the collective bargaining agreement entered into between East Texas Motor Freight and the Southern Conference of Teamsters covering the State of Texas . . . [and as] all Mexican-American and black applicants for line driver positions with East Texas Motor Freight included in the above area covered by the Southern Conference of Teamsters from July 2, 1965, to the present". Neither the plaintiffs nor the defendants moved for a ruling under Fed.R.Civ.P. 23(c)(1) as to whether the suit could be maintained as a class action, and the court made no ruling until after the trial was completed. In its findings the court stated:

31. Plaintiffs have at no time moved for a prompt determination of the question of whether or not this cause of action should be maintained as a class action and have offered no credible proof on the question.

32. Plaintiffs have offered no proof of liability or damages as to any class, having confined the evidence, arguments and post trial brief to the individual claims of the named plaintiffs, and having stipulated at the commencement of trial that the only issue before this Court with respect to the defendant truck line involved its failure to consider the individual plaintiffs' application for employment as road drivers.

Concluding that the cause of action was "not a proper one for class action", the court dismissed the class action claims. In our opinion, the district court's dismissal of the class action was erroneous.

Rule 23(c)(1) provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained".

A class action may not be dismissed because the class representatives fail to ask for a ruling on the propriety of the class nature of the suit. That responsibility falls to the court. "The court has an independent obligation to decide whether an action brought on a class basis is to be maintained even if neither of the parties moves for a ruling under subsection (c)(1)". Wright & Miller, Federal Practice and Procedure, Civil § 1785 (1972).

■ The plaintiff class representatives, of course, must establish that the action meets the requirements of Rule 23(a).[10] See Rossin v. Southern Union Gas Co., 10 Cir. 1973, 472 F.2d 707, 712; Johnson v. Georgia Highway Express, Inc., 5 Cir. 1969, 417 F.2d 1122, 1125 (Godbold, J., concurring); 3B J. Moore, Federal Practice ¶ 23.02–2 (2d ed. 1974); Wright & Miller, Civil § 1759 at 578. But the requirements of Rule 23(a) must be read liberally in the context of suits brought under Title VII and Section 1981. See Wright & Miller, Civil § 1771. Suits brought under these provisions are inherently class suits. By definition, discrimination on the basis of race or national origin is a class wrong. Oatis v. Crown Zellerbach Corp., 5 Cir. 1968, 398 F.2d 496, 499. And a suit charging employment discrimination is naturally "a sort of class action for fellow employees similarly situated". Jenkins v. United Gas Corp., 5 Cir. 1968, 400 F.2d 28, 33; see Parham v. Southwestern Telephone Co., 8 Cir. 1970, 433 F.2d 421, 428; cf. Newman v. Piggie Park Enterprises, 1968, 390 U.S. 400, 401–402, 88 S.Ct. 964, 19 L.Ed.2d 1263. When class relief is sought in the complaint, therefore, the court should liberally apply the requirements of Rule

23(a). See Bing v. Roadway Express, Inc., 5 Cir. 1973, 485 F.2d 441, 446; compare Danner v. Phillips Petroleum Co., 5 Cir. 1971, 447 F.2d 159, 164 (class relief not sought in complaint).[11]

■ There is no serious dispute that the plaintiffs here satisfied the first three criteria in Rule 23(a). The class clearly meets the requirements that the members be so numerous that joinder would be impractical, that there are common questions of law and fact, and that the claims and defenses of the representative parties are typical. The defendants argue strenuously, however, that there was insufficient guarantee that the named parties would "fairly and adequately protect the interests of the class".

The defendants maintain that the named plaintiffs have acted antagonistically to the interests of a majority of Mexican-American and black city drivers. The complaint requests that the court order the city and line driver seniority lists merged to create a single seniority system based solely on the date that an employee first joined the company. The desirability of such relief, argue the defendants, was expressly rejected at a membership meeting of the defendant Local 657 on February 11, 1973, approximately two weeks after the completion of the trial. An affidavit recounting the results of voting at the meeting was admitted into evidence under Fed.R.Civ.P. 59. At the meeting the union members voted 87 to 21 against a proposal that the city and road driver contracts be merged and that city drivers be permitted to transfer to the road while road drivers were permitted to transfer to the city. Of the 138 people present at the meeting, 121 were city

---

10. (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
Fed.R.Civ.P. 23.

11. In *Danner* this Court expressly limited its holding: "All we hold is that class action relief must be predicated upon a proper class action complaint satisfying all the requirements of Rule 23". 447 F.2d at 164 n. 10.

pick-up and delivery drivers. Eighty-three were Mexican-American, 42 were Anglo, and 13 were Negro. If all possible Anglo votes were deducted from the total against it, the proposal still would have been rejected by a majority of Mexican-American and Negro votes.

We do not ascribe the significance to the vote that the defendants urge. We cannot tell what assumptions were made implicit. Furthermore, the membership of Local 657, even the Mexican-American and black membership, is far from congruent with the class described in the complaint. The Local's membership is both more restricted and more extensive. The Local draws its membership from the San Antonio area; the complaint covers city drivers throughout Texas. The Local has members who work for trucking firms other than ETMF; the class outlined in the complaint is restricted to employees or applicants of ETMF. The extent to which the vote represents the actual preference of the class, therefore, is unclear.

Even taking the results of the vote at face value,[12] we reject the district court's conclusion that there was sufficient reason to dismiss the class action in this case. Especially in light of the fact that the evidence of the union vote was not received until two weeks after the trial, there were two preferable options open to the trial judge. First, he could have shaped the class to remove any possible antagonism between the representatives and some of the city drivers. The court could have narrowed the class or separated it into subclasses for purposes of relief. See Oatis v. Crown Zellerbach Corp., 398 F.2d at 499.

Or, the court could have shaped the relief to avoid any injustice to the dissenting class members. District courts have wide discretion in fashioning relief under Title VII, Franks v. Bowman Transportation Co., 5 Cir. 1974, 495 F. 2d 398, 414; Bing v. Roadway Express, Inc., 485 F.2d at 448–449. And flexibility and careful tailoring of judicial decrees in Title VII cases are the order of the day. See, e. g., Sabala v. Western Gillette, Inc., S.D.Tex.1973, 362 F.Supp. 1142. The disagreement here concerned only the proper remedy; there was no antagonism with regard to the contention that the defendants practiced discrimination against the plaintiff class. We do not believe that disagreement within the class as to the remedy desired, surfacing so late in the litigation, should have resulted in a dismissal of the class action.

Because the trial was completed before the court made a ruling whether the class action could be maintained, there were involved none of the imponderables that make the decision so difficult early in litigation, and that demand a substantial amount of district court discretion and corresponding appellate deference. See Johnson v. Georgia Highway Express, Inc., 417 F.2d at 1123. We have before us a record of the proceedings, completed as a class action, and we can judge for ourselves the possible effects of any antagonism of interests. We find these effects insubstantial and curable. We conclude that the plaintiffs met the requirements of Rule 23(a) and established a proper class action under Fed.R.Civ.P. 23(b)(2).[13]

---

12. The outcome of the vote is consistent with what one might expect of a vote of ETMF's San Antonio city drivers. Separate seniority rosters in separate contracts prevent laid-off road drivers from bumping less senior city drivers from their jobs. Because ETMF does not domicile road drivers in San Antonio, to take advantage of a merger of seniority rosters and obtain a road job, a San Antonio city driver with ETMF would have to move to another city. Those city drivers who would not desire such a move, or who would not desire to transfer to the road for some other reason, would not gain from a merger of seniority rosters. We note that in a similar case a court has recently refused to order a merger of seniority rosters because to do so would injure those members of the plaintiff class who did not wish to transfer to road driving jobs. Sabala v. Western Gillette, Inc., S.D.Ky.1973, 362 F.Supp. 1142, 1153.

13. (b) Class Actions Maintainable. An action may be maintained as a class action if

■ The district court's finding that the plaintiffs offered no proof on the question of liability or damages to any class is clearly erroneous. As we describe more fully below, the plaintiffs entered into evidence statistics sufficient to present a prima facia case of past hiring discrimination, transmitted into the present by the no-transfer rule and separate seniority rosters which "lock" employees into city driver positions and prevent their transfer to road driver status. The plaintiffs further submitted, without objection, detailed information pertaining to all ETMF city drivers including their names, seniority dates, and domiciles. It is true, as the district court noted, that the plaintiffs concentrated at trial on the individual claims of the named plaintiffs. But the plaintiffs were not required to present more than a prima facie case of discrimination against the class. Nor did the plaintiffs effectively abandon their class claims by stipulating that "the only issue presently before the Court pertaining to the company is whether the failure of the Defendant East Texas Motor Freight to consider Plaintiffs' line driver applications constituted a violation of Title VII and 42 U.S.C. § 1981". The stipulation was apparently entered in an attempt to eliminate some confusion in the exposition of evidence at trial, not to foreclose the class issues. The plaintiffs continued to proceed as in a class action. And this was made clear to the trial court and the defendants.[14]

■ To the extent that the district court's finding that the plaintiffs failed "to offer proof of liability or damages as to any class" refers to the class of "all Mexican-American and black applicants for line driver positions with East Texas Motor Freight", the finding is not erroneous. The plaintiffs never pursued the action on behalf of these individuals, and the district court's dismissal of the class action on their behalf was proper. On remand, the class considered for relief should be defined as all of East Texas Motor Freight's Mexican-American and black city drivers included in the collective bargaining agreement entered into between East Texas Motor Freight and the Southern Conference of Teamsters covering the State of Texas.

## III.

### Liability

In the last few years we have seen a large number of suits brought in federal court, attacking facially neutral policies

---

the prerequisites of subdivision (a) are satisfied, and in addition:

. . . . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole;

Fed.R.Civ.P. 23.

14. The following colloquy took place between the trial judge and Mr. Heidelberg, counsel for the plaintiffs:

THE COURT:
I assume, this being a matter before the court, that Mr. Heidelberg probably has in mind using this witness to establish a general practice and to show that this man was similarly treated although he may have no personal complaint. It would merely corroborate the testimony that such a practice exists. For that limited purpose—

MR. HEIDELBERG:
For that purpose and also, Your Honor, it has not been established that this is not a class action. The allegation is made in the complaint and there have been no motions filed. The answers of the defendants deny that this is a class action, but of course we maintain that there is class action involved.

THE COURT:
Well, are you contending now as far as this trial is concerned that this is a class action?

MR. HEIDELBERG:
Yes, Your Honor.

THE COURT:
And how many people are you going to try to establish this by?

MR. HEIDELBERG:
As outlined in the complaint, Your Honor, the class would consist of the Mexican-American and black city drivers who are located in the State of Texas covered by the jurisdiction of the Southern Conference Supplemental Agreement.

which allegedly discriminate against minority city drivers by perpetuating patterns of discrimination in the hiring of line drivers by private firms in the trucking industry.[15] As the federal courts have thus become familiar with the practices in the trucking industry, a clear pattern has emerged: throughout much of the industry, trucking companies, and the unions representing drivers, have erected barriers to the movement of non-white/non-Anglo workers from pick-up and delivery jobs to the coveted road driver positions. The employment practices attacked in this suit —the no-transfer and seniority policies —are prevalent in the trucking industry. Typically, city drivers are not permitted to transfer to line driver jobs. Where they are, they are not generally permitted to carry over their seniority for job bidding and lay off purposes. The result is, at the very least, a strong disincentive for city drivers to transfer to the road. City drivers are thus effectively "locked in" their city driving jobs with no realistic possibility of transferring to line driving positions. Were there no more to the scenario, of course, the federal courts would likely have no concern; there is nothing per se illegal in no-transfer or separate seniority policies. But, as the courts have noted with some frequency, the policies often operate to perpetuate the effects of hiring discrimination. The overall result is a situation where in many areas of the country blacks and Mexican-Americans serve as city drivers, while road-driver fleets in private trucking firms, at least until very recently, have been virtually all-white/Anglo.[16] Thus it is that facially neutral no-transfer and seniority

policies have come under a broad attack, for "[i]t is now beyond cavil that Title VII of the Civil Rights Act of 1964 proscribes employment practices and procedures which, although presently neutral and nondiscriminatory on their face, tend to preserve or continue the effects of past discriminatory practices". United States v. N. L. Industries, Inc., 8 Cir. 1973, 479 F.2d 354, 360. See Griggs v. Duke Power Co., 1971, 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158; Pettway v. American Cast Iron Pipe Co., 5 Cir. 1974, 494 F.2d 211, 236; Local 189, United Papermakers & Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980, 990–991, cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100.

### A. *Discrimination by East Texas Motor Freight*

We begin by examining the past hiring patterns of ETMF. See United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, 450, cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815. Although the plaintiffs do not attack ETMF's road-driver hiring practices—and indeed stipulated that they are not now discriminatory—we must begin there. A pattern of past discriminatory hiring is essential to the plaintiffs' case. See Jones v. Lee Way Motor Freight, Inc., 10 Cir. 1970, 431 F.2d 245, 247, cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237.

A prima facie case of discrimination may be established by statistical evidence, and statistical evidence alone. "The inference [of discrimination] arises from the statistics themselves and no other evidence is required to support the inference." United

---

15. See, e. g., the cases cited in note 17 *infra*.

16. Two recent studies have confirmed that Negroes and Mexican-Americans have been excluded from line driving jobs. One study found that, nationally, Negroes comprised only 2.4 percent of the over-the-road drivers for private trucking firms in 1968. Firms that employed more than 100 persons had only one-percent Negro road drivers. Leone, The Underutilization of Negroes as Truck

Drivers By For-Hire Motor Carriers, 22 Lab.L.J. 631, 633 (1971). Another Study, covering 329 trucking companies for the year 1970, found that Negroes comprised 2.7 percent of the companies' road drivers. In these same companies, Spanish-surnamed Americans made up only .8 percent of the road drivers. See Nelson, Equal Opportunity in Trucking: An Industry at the Crossroads (GPO 1971).

States v. Hayes International Corp., 5 Cir. 1972, 456 F.2d 112, 120. The statistics in the instant case are overpowering. East Texas Motor Freight has stipulated that prior to the date that Rodriguez filed a charge of discrimination with the EEOC in 1970, ETMF had never employed a Negro or Mexican-American as a line driver in that portion of the State of Texas covered by the Southern Conference Area Supplemental Agreement. By the date of trial, two and a half years later, ETMF had hired three Mexican-Americans to join its Texas road driver force of approximately 180 drivers. By trial ETMF had still not hired a Negro road driver in Texas.

These figures establish a prima facie case of past discrimination in hiring. In other trucking cases the statistics have shown a similar pattern. In Jones v. Lee Way Motor Freight, Inc., 10 Cir. 1970, 431 F.2d 245, 247, for example, the Court summarized: "[T]here were no Negro line drivers; most whites were line drivers; and all Negroes were city drivers." Similarly, in Bing v. Roadway Express, Inc., 5 Cir. 1971, 444 F.2d 687, 688, the Court noted: "All road drivers are, and always have been white; all Negro drivers are city drivers, though not all city drivers are Negro." The

similarity between the employment situations in both *Bing* and *Jones* and that here is striking. In *Bing* and *Jones*, and in each of the cases cited in the margin, the court held that the statistics were sufficiently potent to constitute a prima facie case.[17]

■■■ Once the plaintiffs established a prima facie case, the burden fell to the defendants to rebut the statistics or to explain the disparity in hiring.[18] See Rowe v. General Motors Corp., 5 Cir. 1972, 457 F.2d 348, 358. Having stipulated to the statistics, the defendants cannot, of course, dispute them. But the defendants do imply that the force of the statistical disparity is countered by the plaintiffs' stipulations that ETMF's qualifications for road drivers are not discriminatory and that the plaintiffs were employed at the San Antonio, terminal without regard to race or national origin. The defendants also argue that the plaintiffs have not shown that any members of the plaintiff class were qualified as road drivers. We reject these contentions.

■■■ First, only historical hiring practices are at issue here. Whatever the nature of present hiring practices,[19] they neither explain nor justify, without more, the past failure to hire minority line drivers. Without some proof

17. Thornton v. East Texas Motor Freight, 6 Cir. 1974, 497 F.2d 416 (At ETMF's Memphis terminal, all of the 105 road drivers were white. Of the 131 city drivers, 43 were black.); Witherspoon v. Mercury Freight Lines, Inc., 5 Cir. 1972, 457 F.2d 496 (No black had ever worked for Mercury Freight as a long haul driver.); Hairston v. McLean Trucking Co., M.D.N.C.1973, 62 F. R.D. 642 (Of 479 over-the-road drivers at Winston-Salem terminal, nine were black.); United States v. Navajo Freight Lines, Inc., C.D.Calif.1973, 6 FEP Cases 274 (No black or Spanish-surnamed road drivers until 1970.); Sabala v. Western Gillette, Inc., S. D.Tex.1973, 362 F.Supp. 1142 (Of 29 road drivers in Houston, 28 were white/anglo; one was Mexican-American. Of 65 drivers in Houston, 42 were either black or Mexican-American.); United States v. Lee Way Motor Freight, Inc., W.D.Okl.1973, 7 EPD ¶ 9066 (940 road drivers were white, 14 were black, and 12 were other than white or

black.); Sagers v. Yellow Freight System, Inc., N.D.Ga.1972, 6 EPD ¶ 885 (In 1968 of 150 road drivers for Yellow Freight in the Southern Conference area, none were black. As of May 12, 1972, only 3.6 percent of Yellow Freight's road drivers in the Southern Conference Area were black).

18. Although the union defendants are not responsible for ETMF's hiring policies, the case against the unions, like that against ETMF, begins with the showing of past hiring discrimination that originally operated to foreclose the road driver jobs to blacks and Mexican-Americans. See p. 60, *infra*. The unions thus join ETMF in its effort to rebut the prima facie case of hiring discrimination.

19. We do not accord the plaintiffs' stipulation concerning present hiring practices the broad reading that the defendants do. See pp. 57–58, *infra*.

presented by the defendants to the contrary, we must assume that the "lily white"/Anglo nature of the ETMF road driver fleet until 1970 resulted from discriminatory hiring practices.

Second, we accord no weight to the stipulation that the named plaintiffs were not discriminated against when they were hired at the San Antonio terminal as *city* drivers. It was their inability to gain a *road* driver job with ETMF at any terminal in Texas that the plaintiffs decry.

Finally, the defendants rely on language from McDonnell Douglas Corp. v. Green, 1973, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, in which the Court said:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Nothing in this language is inconsistent with the accepted practice of federal courts' recognizing statistics as establishing a prima facie case of employment discrimination. Sagers v. Yellow Freight System, N.D.Ga.1973, 5 EPD ¶ 8885 at 5759. In *McDonnell Douglas* a black worker, laid off in a reduction-in-force, complained that he was not re-hired because of his race and involvement in the civil rights movement. The Court emphasized that the "critical issue . . . concerns the order and allocation of proof in a private, [*non-class-action*] challenging employment discrimination". 411 U.S. at 800, 93 S.Ct. at 1823. (emphasis supplied). Furthermore, the Court observed in a crucial footnote that the test outlined in the text of the opinion for a prima facie case "is not necessarily applicable in every respect to differing factual situations". 411 U.S. at 802, n. 13, 93 S.Ct. at 1824.

The present case differs in several significant respects from *McDonnell Douglas*. First, this is a class action. Equally important, the Supreme Court noted in *McDonnell Douglas* no history of past employment discrimination or any other factor that might have discouraged the respondent from applying for a job. Indeed, he had had a job with the company, and its refusal to re-hire him after his layoff formed the gravamen of the complaint. In contrast, at the time of Rodriguez's complaint to the EEOC, ETMF had never hired a black or Mexican-American line driver in the Texas-Southern Conference area. Given these past hiring practices, "it is not unreasonable to assume that minority persons [would] . . . be reluctant to apply for employment, absent some positive assurance that if qualified, they [would] in fact be hired on a more than token basis". Carter v. Gallagher, 8 Cir. 1972, 452 F.2d 315, 331 (en banc). It would be unrealistic to require the plaintiffs to show that blacks and Mexican-Americans applied for road driver jobs they knew they could not obtain. See Bing v. Roadway Express, Inc., 485 F.2d at 451; Jones v. Lee Way Motor Freight, Inc., 431 F.2d at 247. We note also another distinction. In *McDonnell Douglas* the respondent's qualifications were undisputed. He had held the job, and apparently served satisfactorily, before he was laid off. In the instant case, in contrast, the possibility of meeting one of the most important criteria for hiring—the road test—has been denied to the class of city drivers. Deprived of the opportunity to take a driving test, the plaintiffs could not prove they were qualified to become road drivers.

Proof that the relevant labor pool lacks qualified minority persons may, of course, even in a class action, rebut a prima facie case of hiring discrimination. Congress did not intend

that Title VII force employers to hire unqualified applicants of *any* race or ethnic background. Griggs v. Duke Power Co., 410 U.S. at 430, 91 S.Ct. 849; Sagers v. Yellow Freight System, Inc., 5 EPD at 5758. But it was ETMF's burden to show that its history of hiring only white/Anglo line drivers resulted from a scarcity of available Negroes and Mexican-Americans qualified to serve in that position. United States v. Hayes International Corp., 456 F.2d at 120. ETMF has not met this burden.

The next steps in our analysis were clearly delineated by Judge Thornberry in *Bing*: "Once it has been established that an employer or union has discriminated in the past, then, the inquiry is twofold: (1) Does the present policy perpetuate the past discrimination? (2) Is the present policy justified by a showing of business necessity?" 444 F.2d at 690.

The conclusion is inescapable that both the no-transfer policy and the maintenance of dual seniority rosters, one for city drivers and one for line drivers, have perpetuated ETMF's past discriminatory hiring practices. Together, they have removed all realistic opportunity for transfer. Under the no-transfer policy a city driver wishing to transfer to road status must first resign his city driver position, with no assurance that he will be hired as a line driver, and no assurance that if he fails to be hired he will be rehired as a city driver. Even if the city driver were to become a road driver, because of the separate seniority rosters he would lose his accumulated competitive-status seniority. He would have the last choice of routes and would be the first laid off. And if laid off, he would have no "bumping" rights to recover his city driver job. "In any industry loss of seniority is a critical inhibition to transfer." 451 F.2d at 453. It is no surprise, then, that when the company temporarily relaxed in 1972 its no-transfer policy and its requirement that road drivers have three years line haul experience only five ETMF city drivers in

the entire Southern Conference area took, qualified for, and held the road driver job. For a city driver with a significant amount of seniority the choice must have been a difficult one indeed. The named plaintiffs testified that they were unwilling to give up their city driving seniority to transfer to road driving jobs they otherwise desired. In the strictest sense, city drivers were "locked" into city driving jobs. The discrimination that removed the possibility that a Mexican-American or Negro could obtain a line driver job when first applying to the company was thus continued and perpetuated by the no-transfer and seniority policies which prevented the city drivers from later transferring to road driver jobs.

We turn to the question whether ETMF has justified the no-transfer policy and seniority system by a showing of business necessity. The business necessity standard is strict.

"[T]he 'business necessity' doctrine must mean more than that transfer and seniority policies serve legitimate management functions. Otherwise, all but the most blatantly discriminatory plans would be excused even if they perpetuated the effects of past discrimination. . . . Necessity connotes an irresistable demand. To be preserved, the seniority and transfer system must not only directly foster safety and efficiency of a plant, but also be essential to those goals. . . . If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the present policies may not be continued.

United States v. Bethlehem Steel Corp., 2 Cir. 1971, 446 F.2d 652, 662, cert. denied, 404 U.S. 959. "In other words, management convenience and business necessity are not synonymous." United States v. Jacksonville Terminal Co., 451 F.2d at 451.

The business necessity test essentially involves balancing the need for the challenged practice or policy against

its discriminatory impact. The business purpose must be "sufficiently compelling to override any racial impact"; it must "effectively and efficiently" carry out its business purpose; and there must be no acceptable alternative practice. Pettway v. American Cast Iron Pipe Co., 494 F.2d at 246; Robinson v. Lorillard Corp., 4 Cir. 1971, 444 F.2d 791, 798, cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655.

■ ETMF advances two justifications for its no-transfer policy. The company first contends that the no-transfer policy is necessary to protect employees, property, and the general public. ETMF conjures up visions of an unqualified driver "hurtling through space, if you will, at 60 miles an hour with a rig of gross vehicle weight of 72,000 [pounds]".[20] While we do not underestimate the potential dangers raised by unqualified drivers, these can be effectively diminished by carefully screening transferees.[21] See Thornton v. East Texas Motor Freight, 6 Cir. 1974, 497 F.2d 416; Bing v. Roadway Express, Inc., 444 F.2d at 691. The visions invoked by ETMF argue for continued strict qualifications for road drivers, but they are not sufficient justification for the no-transfer policy. Second, ETMF argues that as a driver-salesman the city driver's contact with customers is an important element in customer relations. The implication is that if city drivers are permitted to transfer, ETMF might lose customers. We must reject this contention also. Loss of city drivers by transfer is no more harmful to the company's pick-up and delivery business than loss for any other reason. We agree with the district court in Sagers v. Yellow Freight System, Inc., 6 EPD at 5760:

The city driver's unique functions and skills may justify treating it as a separate job classification from that of road driver; it does not constitute an overriding business justification for denying qualified city drivers the opportunity to transfer to the road driver position where the latter position was initially closed to them on the case of race.

ETMF portrays its seniority system as preferred by the majority of black and Mexican-American city drivers. The company relies on the vote taken at the membership meeting of Local 657 where a majority of the blacks and Mexican-Americans rejected a proposal to merge city and road seniority rosters. "It is obviously good personnel management", argues ETMF, to honor the preference of its Mexican-American and black employees. Furthermore, the company hints, if it had acted to merge the seniority lines, it might have been subject to legal action by those blacks and Mexican-Americans who desired dual lists, contending that the merger constituted a violation of Title VII. See Graham v. Missouri-Pacific Truck Lines, S. D.Tex.1973, [C.A. 71–11–1229, Feb. 2, 1973]. Whatever the merits of this argument as it is couched by ETMF, when relief is viewed in terms other than a merger of seniority lines, such as a once-only transfer by city drivers to line jobs with seniority carryover, any force behind the contention evaporates. ETMF's explanations do not meet the question why those blacks and Mexican-Americans who have desired to transfer have not been permitted to do so and to carry over their competitive-status seniority. Nor is it explained how permitting those city drivers to carry over their seniority would hurt other city drivers or be objectionable to them.[22]

20. Brief for Appellee East Texas Motor Freight 33, quoting testimony of H. L. Johnson, President of ETMF.

21. ETMF has a continuous training program for road drivers, which includes on-the-job training. The training program was accelerated after the no-transfer system was temporarily modified in 1972.

22. ETMF might have argued that to permit city drivers to carry over their seniority to road driver jobs would have been in violation of its contract with the local unions representing the line drivers, not parties to this case. Certainly the company might have anticipated some difficulty from those quarters, for permitting carryover of seniority

The company finally contends that the plaintiffs have nevertheless failed to establish liability, because they have not shown that any of the plaintiff class meets ETMF's road driver qualifications. The argument is in essence that if members of the plaintiff class of city drivers cannot qualify for road driver jobs, how can it be said that it is the no-transfer and seniority policies that lock them in city jobs? Rather, the argument continues, city drivers are locked in by their inability to qualify for the sought-after line driver jobs, and ETMF is under no obligation to permit city drivers to transfer to line driver jobs for which they are unqualified.

ETMF would have us reverse the burden of proof, placed firmly on the defendant by the plaintiffs' prima facie case of past hiring discrimination perpetuated by facially neutral practices and policies. We stated earlier that the burden rested on the defendants to show that the failure to hire minority persons as road drivers resulted from an absence of qualified minority drivers available. So too we think the burden must remain on the defendants to prove that the discrimination shown by the plaintiffs' prima facie case is not perpetuated by present policies in that no minority city drivers are now qualified to transfer to road driver jobs. To our knowledge no court has hinged a finding of liability in a trucking case on proof that the plaintiff class of city drivers contains those qualified to assume road driver responsibilities. That some of the class will be found qualified to transfer when the

discriminatory restrictions are removed has been uniformly assumed. Winnowing the qualified from the unqualified has been left to the remedy stage; only those city drivers wishing to transfer who meet objective and nondiscriminatory standards of the company are, in the final analysis, entitled to relief.

We agree with this approach. It is not the failure to hire as a line driver every city driver who would like to transfer to the road that forms the gist of the complaint in cases like the one before us. It is the policies of the company which discourage and prevent transfer regardless of qualifications that are under attack. In sum, we are of the opinion that ETMF had the burden of proving that none of the plaintiff class was qualified to transfer to the road.[23] It was not the burden of members of the plaintiff class to establish their qualifications before a case of discrimination could be made.

We recognize that by a literal reading of ETMF's road driver requirements, none of the plaintiff class of city drivers could qualify for a road driver job. No present city driver has three years *"immediate* prior line haul experience". Nor, we assume, do many city drivers have three years experience on the road, gained at any time; the spate of trucking cases that have been marched through the federal courts give clear indication of the difficulty that blacks and Mexican-Americans have had nationwide obtaining road driver jobs with private trucking firms. We do not, however, accept the criteria ETMF employs in de-

---

into road jobs would put transferees ahead of some road drivers in seniority. Neither the threat of union difficulty nor the possibility that giving transferees seniority on the road driver roster would violate ETMF's contract with the road driver locals, however, would have provided a sufficient justification for refusing to give transferees seniority. Labor unrest stemming from interference with the expectations of whites was found not to amount to a business necessity in United States v. Bethlehem Steel Corp., 2 Cir. 1971, 446 F.2d 652, Robinson v. Lorillard Corp., 4 Cir. 1971, 444 F.2d 791, 798–799 and Local 189, United Papermakers and

Paperworkers, 5 Cir. 1969, 416 F.2d 989. Furthermore, difficulties caused by the fact that city and road drivers were covered by different union contracts was rejected as a business necessity in Bing v. Roadway Express, Inc., 5 Cir. 1971, 444 F.2d 687, 691, and Jones v. Lee Way Motor Freight, Inc., 10 Cir. 1970, 431 F.2d 245, 250.

23. Ezra Bierle, dock foreman at ETMF's San Antonio terminal, testified that from 1968 or 1969 the tractor-trailer equipment driven by city and road drivers has been essentially the same.

termining whom to hire as road drivers. ETMF's road driver requirements must be read against the business necessity test. That standard, always stringent, requires that we scrutinize requirements of experience when that experience has been discriminatorily denied.

Although requiring experience at a particular job is neutral and job-related on its face [see Developments in the Law-Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1145 (1971)], it is discriminatory to require experience as a prerequisite to employment when the experience is unavailable to minority persons. Blumrosen, Seniority and Equal Opportunity: A Glimmer of Hope, 23 Rut.L.Rev. 268, 309 (1969). We have in this Circuit approved a lower court's striking down an experience requirement as a criterion of membership in a labor union when "negroes were prevented from gaining such experience due to the union's racial discrimination". Local 53, International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, 5 Cir. 1969, 407 F.2d 1047, 1054–1055; see also United States v. Sheet Metal Workers, Local 36, 8 Cir. 1969, 416 F.2d 123; Dobbins v. Local 212, International Brotherhood of Electrical Workers, S.D. Ohio 1968, 292 F.Supp. 413. More significantly, we held in United States v. Jacksonville Terminal Co., 451 F.2d at 453, that where blacks were prevented by racial discrimination from utilizing their skills in the railroad industry, experience as a job criterion could not properly be confined to *railroad* experience. We do not imply that all experience requirements that act to perpetuate discrimination are illegal; only that they are illegal unless justified as a business necessity. And, as we have said, ETMF has not proved that three years' immediate line-haul experience is a business necessity for transfer of its city drivers to line-haul duties.

The defendants place great reliance on the plaintiffs' stipulation that "[t]he standards and qualifications of East Texas Motor Freight for its road drivers are not discriminatory". The defendants argue that, rather than conceding only that the criteria are facially neutral, the stipulation waived any argument that the road driving requirements have a disparate impact and discriminatory effect. We do not accord the stipulation such a prominent position in this suit. As we have noted, ETMF's criteria for road drivers automatically exclude all members of the plaintiff class, including the named plaintiffs. No city driver now employed can have three years *immediate* prior line haul experience. And none of the named plaintiffs, at least, has three years experience road driving gained at any time. By the defendants' reading of the stipulation, therefore, the plaintiffs have disqualified themselves from the very relief they seek most urgently—transfer to road driver jobs. We cannot accept the interpretation that the plaintiffs, represented by counsel conceded by the defendants to be experienced Title VII attorneys, stipulated away their right to relief on the eve of trial.

In conclusion, the plaintiffs established an unrebutted prima facie case against ETMF of past hiring discrimination. It is manifest that the harmful effects of this past discrimination have been transported into the present through ETMF's facially neutral no-transfer and seniority policies. No compelling business necessity has been offered to justify ETMF's policies. In our view the district court's finding that ETMF did not discriminate against the named plaintiffs, or by implication the plaintiff class, is clearly erroneous. ETMF must be held to have violated 42 U.S.C. § 2000e–2 [24] and 42 U.S.C § 1981.[25]

---

24. See note 1 *supra.*

25. See note 2 *supra.*

B. *Discrimination by Local 657 and the Southern Conference*

The plaintiffs contend also that Local 657 and the Southern Conference of Teamsters have acted to perpetuate the discrimination against the plaintiff class of city drivers by creating collective bargaining agreements that establish separate seniority rosters for road and city drivers without provision for seniority carryover for minority city drivers who desire to transfer to road jobs. Before examining the substance of this contention, we pause to outline in more detail the manner in which the collective bargaining agreement between ETMF and Local 657 came into being.

Although the collective bargaining agreement is a contract between ETMF and Local 657, it is the product of negotiation on a national and regional scale. First, there is the National Master Freight Agreement, negotiated on a nationwide basis between the Trucking Employers, Inc. and the National Over-the-Road and City Cartage policy and Negotiating Committee of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. The National Negotiating Committee represents the local unions; the locals give powers of attorney to permit the National Negotiating Committee to act on their behalf. Although the Master Agreement must be ratified by the locals, ratification is generally a formality. Once the agreement is accepted by a majority of the local unions, it goes into effect and binds all locals.[26] The Master Agreement covers both city and road drivers. Then there are the Supplemental Agreements. Like the Master Agreement, although Supplemental Agreements are signed and administered by each local union at each terminal, "they are negotiated on an areawide basis by Local representatives of employees of all unionized trucking companies in that area". United States v. Pilot Freight Carriers, Inc., M.D.N.C.1972, 54 F.R.D. 519, 521. In our case the Supplemental Agreements were negotiated by the Southern Conference of Teamsters. From these negotiations came, so far as we are now concerned, two separate agreements, one covering road drivers and one covering city drivers. The agreements provide for seniority to run from the date of entry into a particular collective bargaining unit. At the terminal level, these separate agreements are administered by union locals. In the case before us, the city drivers for ETMF in San Antonio are represented by Local 657. Local 657 is an integrated union. Since 1952 a majority of the employees working for ETMF within the jurisdiction and membership of Local 657 have been blacks and Mexican-Americans.

[redacted] As we mentioned earlier, it is the creation and maintenance of separate seniority rosters for road and city drivers without provision for seniority carryover by minority city drivers that forms the crux of the complaint against the union defendants. We agree with the plaintiffs that the discrimination against the black and Mexican-American city drivers that closed out the possibility of their being hired originally as road drivers was continued and reinforced by union action and inaction. For their role in continuing the effects of this discrimination the union defendants must share the blame and the liability.

We recognize that the prima facie case against ETMF for discrimination in the hiring of road drivers falls only indirectly against the union defendants. The company has always exercised full responsibility for hiring; the unions have never exercised any. We have discussed how the inability of city drivers

26. *International Brotherhood of Teamsters,* Chauffeurs, Warehousemen and Helpers of America, Constitution, art. XVI, § 4 (1966). "While there is a separate formal contract between each local union and [the defendant company] in effect, the National Master *Freight Agreement is published in pamphlet* form and accepted nationwide, with a blank in which the number of each individual local union is inserted." Sagers v. Yellow Freight System, Inc., N.D.Ga.1972, 58 F.R.D. 54, 57.

to carry over their competitive-status seniority formed an important link in the chain that "locked" minority drivers into city driver jobs. Of this the unions were not unaware. Local 657 concedes in its brief that the "most important thing to an employee working under a collective bargaining agreement, except perhaps for wage rates, is his seniority".[27]

The plaintiffs' prima facie case of hiring discrimination, and proof that the seniority system, a creature of the collective bargaining agreement, transmitted the discrimination into the present, shifted the burden to the defendant unions to show that the present discriminatory effects were unavoidable, that is, required as a business necessity.

The primary justification offered by the union defendants is that in contributing to the establishment of separate seniority rosters they were merely following the desires of the majority of their black and Mexican-American members. Once again the defendants rely on the post-trial defeat by members of Local 657 of a proposal to merge city and road driver contracts as an indication of the preferences of a majority of Mexican-American and black city drivers. As we mentioned earlier, the degree to which the vote should be taken to represent the true desires of members of the plaintiff class is uncertain. In any event, the unions perceive their responsibility too narrowly. There are established ways to eliminate the lock-in effect of separate seniority rosters without merging rosters and jeopardizing the seniority rights of those city drivers who remain in their positions. Most obviously, seniority carryover can be allowed on a one-time-only basis for qualified minority city drivers who wish to transfer to the road. See, e. g., Thornton v. East Texas Motor Freight, supra; Bing v. Roadway Express, Inc., 485 F.2d 441; United States v. Central Motor Lines, Inc., W.D.N.C.1971, 338 F.Supp.

532. No reciprocal arrangement for road drivers would have been necessary, because they have suffered no discrimination. See United States v. Chesapeake & Ohio Ry. Co., 4 Cir. 1972, 471 F.2d 582, 593. We believe a one-time-only transfer with seniority carryover was an alternative that could have eased the discriminatory effects of the separate seniority lists without injury to any minority city driver. This reasonable alternative vitiates the business necessity defense. See United States v. St. Louis-San Francisco Railway Co., 464 F.2d 301 at 308; Robinson v. Lorillard Corp., 444 F.2d at 798.

For their role in establishing separate seniority rosters that failed to make allowance for minority city drivers who had been discriminatorily relegated to city driver jobs, Local 657 and The Southern Conference must be held accountable. They have violated 42 U.S.C. § 2000e–2 and 42 U.S.C. § 1981. The district court's finding to the contrary is clearly erroneous.

### IV.

#### Remedy

Because the district court concluded that the defendants were not liable under Title VII or 42 U.S.C. § 1981, it never reached the question of remedy. We remand for the court's consideration of this issue. The district courts have broad remedial powers to eliminate the present effects of past discrimination, and a large measure of discretion in modeling a decree. Local 53, International Heat & Frost Insulators & Asbestos Workers v. Vogler, 407 F.2d at 1052. The discretion is not unbridled, however, and we provide the boundaries within which the decree in this case must be drawn.

#### A. *Transfer*

We have long subscribed in this circuit to the theory that those who suffer discrimination under Title VII

27. Brief for Appellee Teamsters Local Union 657, at 16.

must be permitted to take their "rightful place" when job openings develop. As we said in Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d at 988:

> The Act should be construed to prohibit the *future* awarding of vacant jobs on the basis of a seniority system that "locks in" prior racial classification. White incumbent workers should not be bumped out of their *present* positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation.

See Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260 (1967). Thus, black and Mexican-American city drivers, many of whom would now be road drivers but for the discrimination of the defendants, must be given an opportunity to transfer to the road as road driving job openings develop.

ETMF need not permit unqualified plaintiffs to transfer to the road, but in determining who is qualified ETMF must use criteria that either have no disparate impact along the lines of race or national original, or that can be justified as a business necessity. We have already stated that the requirement of three years prior road haul experience must give way. Because road driving experience has been denied to blacks and Mexican-Americans as a class, and because ETMF has not justified the experience requirement as essential, it may not be confined to road driving when to do so would discriminate against members of the plaintiff class. ETMF having failed to prove that three years' line-haul experience is a business necessity for transfer, each city driver must be considered to meet the experience re-

quirement by showing three years of city driving on equipment similar to that used over the road.

 The plaintiffs argue that, because not all trucking companies require three years experience, we should also reduce the number of years experience required. See, e. g., Bing v. Roadway Express, Inc., 485 F.2d 441 (1 year); Sayers v. Yellow Freight System, Inc., N.D.Ga.1973, 6 EPD ¶ 8885 (2 years). Once the requirement of *road* experience is removed, however, the experience requirement is not only *facially neutral*, it is *neutral in effect*. Thus it need not be justified as a business necessity. Congress did not intend that Title VII lead to uniform hiring practices across an industry. So long as hiring policies do not discriminate, Title VII does not require their modification.

 We hold, not that all minority city drivers with three years experience at city driving must be permitted to transfer, but only that they may not be excluded unless they fail to meet other qualifications that either have no disparate impact along racial or national-origin lines or that can be justified as essential for safety or efficiency. On remand the district court should monitor carefully the criteria used by ETMF to prevent minority city drivers from transferring to line driving jobs.[28]

To permit minority city drivers the opportunity to return to their "rightful place" in the road driver ranks, the plaintiff class should be divided into sub-classes, one for each terminal in the Texas-Southern Conference area where ETMF domiciles road drivers. ETMF's system of terminal-based responsibility for hiring and of domiciling road drivers only at certain terminals is not discriminatory, and we leave these practices intact. Still, we are not blind to the recognized mobility of today's mi-

---

28. While the in-cab road test is undoubtedly a legitimate method for determining the qualifications of a driver, it may be subject to abuse unless the chances of a subjective judgment by the tester are minimized. See, e. g., United States v. Central Motor Lines, Inc., W.D.N.C.1971, 338 F.Supp. 532, 563. Moreover, a potential transferee who performs inadequately on this test should not be disqualified unless he cannot be expected to improve sufficiently given normal training.

norities. See, e. g., Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 at 1371. We may not assume that blacks and Mexican-Americans who became city drivers at a terminal where road drivers were not domiciled would not have moved to a terminal where road drivers were domiciled had a road driver job been open to them. Therefore, those members of the class who now work in terminals where road drivers are not domiciled must be permitted to join the sub-class of their choice. In other words, they must be provided an opportunity to become road drivers at one of the terminals where ETMF domiciles road drivers. Black and Mexican-American city drivers at terminals where road drivers are domiciled should be placed in the sub-class corresponding to that terminal. We may assume that they are already at the terminal they would have chosen had road driver jobs been open to them in the past.

Within each sub-class, minority city drivers should be permitted the opportunity to transfer as jobs become vacant at that terminal. The minority city drivers should be ranked in the various sub-classes according to their "qualification dates", described below. The ranking should determine the order in which opportunities to transfer are awarded.

■ Over objection at trial, the district court admitted evidence pertaining to the qualifications of the named plaintiffs to become road drivers. The court then found that Rodriguez, Perez, and Herrera were unqualified. In light of the fact that the company admitted by stipulation that it did not consider any of the plaintiffs for employment as road drivers, we believe that the district court's action was premature. The question with regard to the named plaintiffs was not whether they were qualified, but whether ETMF's failure to consider their applications was discriminatory. On remand, the district court should require ETMF to consider the plaintiffs for road driver positions as vacancies occur. The court should supervise carefully the standards used by ETMF to determine whether the plaintiffs are in fact qualified, and should view with particular skepticism any reliance by ETMF on disciplinary actions taken by the company after the plaintiffs initiated their actions with the EEOC.

### B. Seniority Carryover

■ Members of the plaintiff class who transfer to the road must be permitted to take with them seniority for job bidding and lay off purposes. The question is "how much?" In general terms, the answer is that "how much seniority the transferee deserves should be determined by the date he would have transferred but for his employer's discrimination". Bing v. Roadway Express, Inc., 485 F.2d at 450. There is no way to arrive at such a date with exactitude, however, and some method for approximation is necessary.

In Bing we approved a "qualification date" formulation—the date a transferee had the experience necessary to qualify him for a road driving job. 485 F.2d at 451.[29] The Bing test represents a compromise between the trial court's determination in that case that seniority rights should date from when the transferees applied to become road drivers, and the remedy requested by the Government as amicus, that transferees should carry over full company seniori-

29. In this case the qualification date of a member of the plaintiff class of city drivers is the date when, in the employ of ETMF, the individual first accumulated three years combined road and city driving experience gained either with ETMF or with other organizations. If the individual already possessed such experience when hired by ETMF, of course, his qualification date will be the same as his company seniority date.

Similar to Bing, the straight qualification-date calculation must be modified to take account of that period from October 1969 to March 1971, during which ETMF did not hire any road drivers. The seniority of any member of the plaintiff class whose qualification date falls within the period when ETMF did no hiring must date from March 1970, when ETMF resumed hiring.

ty. This Court felt, on the one hand, that the application-date formulation of the district court failed "to account for the realities of entrenched employment discrimination", 485 F.2d at 451; the company defendant's discriminatory practices discouraged city drivers from applying. On the other hand, the Government's theory of full seniority carryover would have given superseniority to those transferees who were not qualified to be road drivers before they began working for the defendant. Until they were qualified, "discrimination could not have blocked their employment as road drivers". *Id.*

The *Bing* qualification-date formulation was rejected recently by a divided panel of the Sixth Circuit. In Thornton v. East Texas Motor Freight, 6 Cir. 1974, 497 F.2d 416, a case involving the same trucking company that is a defendant in the instant case, the Court affirmed the district court's grant of seniority carryover dating from six months after the transferee requested transfer or filed a charge with the EEOC. Although the Court distinguished *Bing* on the grounds that more charges were filed with the EEOC in *Thornton* (thus apparently showing that "silence and futility of protest" were less the norm), the Court also criticized the *Bing* rationale: "The rationale in *Bing* was that silence might be caused by a belief in the futility of a transfer request. That may be true, but also it may be caused by no desire to transfer." 497 F.2d at 421. The Court also noted that "there is something to be said for rewarding those drivers who protest and help to bring rights to a group of employees

who have been victims of discrimination". 497 F.2d 420.

We are unpersuaded by these considerations. First, we think that the best indication whether a person desired transfer to the road in the past is reflected in whether he desires transfer now, so long as we do not create special incentives or disincentives that skew the balance. The qualification-date test of *Bing*, by taking into account experience requirements on the one hand and the effects of entrenched discrimination on the other, is as neutral as any we can envision. Second, the concern showed by the *Thornton* majority for rewarding those who help to bring rights to a group of employees was adequately answered by Judge Phillips, dissenting in part: "Any such 'reward' should not be at the expense of the other victims of the discrimination. Title VII was enacted to protect *all* employees from unlawful discrimination. This is especially true where the discrimination intimidated the employees to such an extent that they felt it would be futile to request a transfer." 497 F.2d at 428. In short, we reaffirm the qualification-date formulation of Bing.[30]

### C. Back Pay

The district court should consider the question of back pay, with particular reference to the guidelines laid down in Pettway v. American Cast Iron Pipe Co., 494 F.2d at 251–263; Johnson v. Goodyear Tire & Rubber Co., 491 F.2d at 1375–1380; and Bing v. Roadway Express, Inc., 485 F.2d at 452–455. In these cases the criteria for the award of back pay, and the method of calculation, have been thoroughly analyzed. The

---

30. This Circuit recently required that transferees in a trucking case similar to this one be permitted use of "full company seniority" in their new positions. Franks v. Bowman Transportation Co., 5 Cir. 1974, 495 F.2d 398, 416. The Court emphasized, however, a critical difference between that case and *Bing:* "In [*Bing*], Roadway had a flat requirement of one year's experience for road drivers, so that the qualification date was easily calculable. To allow the use of company seniority before that date would have

placed the discriminatee in a better position than he could have achieved without the discrimination. In this case, by contrast, Bowman had no rigid one-year experience requirement. It sometimes accepted OTR [over-the-road] trainees with little or no prior driving experience." *Id.* 495 F.2d at 417 n. 17. As in *Bing*, the qualification date in the instant case is easily calculable. The three-years experience requirement 1 as been rigidly adhered to.

most difficult question remaining before the district court will be the apportionment of the burden of paying any back pay awards among the three defendants. Consistent with the broad discretion awarded the district court on this question in Johnson v. Goodyear Tire & Rubber Co., 491 F.2d at 1382, we intimate no view to this question.

### V.

### The Consent Decree

On June 29, 1972, the United States filed a "pattern and practice" [31] suit in the Northern District of Texas against ETMF, the Teamsters International, and the International Association of Machinists and Aerospace workers, challenging nationwide essentially the same practices at issue in the instant private class action. February 19, 1974, approximately one month before we heard oral argument in the case before us, the parties to the Government's suit entered into a consent decree. The decree covered:

A. Such black or Spanish-surnamed city drivers, hostlers, checkers and garage employees who are domiciled at a terminal where road drivers are presently domiciled or where road drivers have been, since July 2, 1965, domiciled under either ETMF or a predecessor company.

B. Such persons who are incumbent city employees employed at a non-road driving terminal who have, since July 2, 1965, indicated a desire to transfer to the road.[32]

In addition to setting some standards for hiring and establishing hiring ratios, the decree established "transfer procedures". City drivers were to be afforded 30 days "to indicate an interest in transferring to the road driver classification at the terminal in which he is employed (if that terminal has an over-the-road operation) or at a terminal within the job market, or to a terminal of his choice (if the terminal at which he is employed has no over-the-road op-

eration) . . . ." The issue of seniority rights was left for later resolution. The decree provided also that ETMF was to furnish a total of $175,000 as back pay compensation for members of the affected class nationwide. Persons accepting a portion of this settlement were to sign a release "stating that such designated portion is accepted in full and final settlement of all claims for monetary compensation, back pay or any other type of relief against ETMF or any predecessor corporation based upon any pending litigation or other alleged discriminatory actions because of race or national origin occurring prior to the date such release is signed".

A judgment by consent binds the parties and those in privity with them. Seaboard Air Line Railroad Co. v. George F. McCourt Trucking, Inc., 5 Cir. 1960, 277 F.2d 593. Members of the plaintiff class in the present action were not parties to the Government's suit, nor do they have interests in privity with the Government. See Williamson v. Bethlehem Steel Corp., 2 Cir. 1972, 468 F.2d 1201, 1203, cert. denied, 411 U.S. 931, 93 S.Ct. 1893, 36 L.Ed. 390; cf. Trbovich v. United Mine Workers of America, 1972, 404 U. S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686.

We hold, therefore, that the consent decree does not operate as collateral estoppel to prohibit any members of the plaintiff class from participating in relief in this case. See also IB J. Moore, Federal Practice ¶ 0.411 [1] (2d ed. 1974). Those members of the plaintiff class who accept compensation under the consent decree and sign a release, of course, are bound by the terms of the release. But no other members of the plaintiff class lose any right to relief in the instant case.

We have chosen not to accord the consent decree any great weight in our outline of the relief to be awarded by the district court. First, the "affected

---

31. See 42 U.S.C. § 2000e–6.

32. The decree also covered some named individuals.

class" awarded relief in the consent decree does not encompass an important segment of the plaintiffs' class here—black and Mexican-American city drivers at "non-road driving" terminals in the Texas-Southern Conference area who have not "indicated a desire to transfer to the road". The Government's remedy is thus based implicitly on the theory, one we reject, that the acceptance by a black or Mexican-American of a job as a city driver at a city-only terminal, at a time when no road positions were open to him, signifies a lack of interest in a road driver position. Rather, we have taken cognizance of both the mobility of the modern work force and the reality of entrenched employment discrimination that makes a request to transfer a futile gesture. Second, private plaintiffs in class actions under Title VII and the United States in "pattern and practice" suits protect different interests: the Government protects general economic interests in addition to the rights of minorities; private plaintiffs represent only the interests of minority group members. United States v. Local No. 3, Operating Engineers, N.D.Calif.1972, 4 FEP Cases 1088, 1093. While the Government may be willing to compromise in order to gain prompt, and perhaps nationwide, relief, private plaintiffs, more concerned with full compensation for class members, may be willing to hold out for full restitution. Finally, we cannot ignore the possibility that, if we permit negotiated settlements by the Government to control the relief accorded in pending private actions against the same plaintiffs, private actions will be significantly discouraged. Such a result would have a deleterious effect on enforcement of Title VII and would not, in our opinion, be consistent with the intent of Congress.

We are not unmindful of the argument that by going beyond the relief awarded by the consent decree we may discourage defendants in "pattern and practice" suits from entering into settlements with the United States when a Title VII private class action is proceeding simultaneously against the same defendant. The court in *Local No. 3, Operating Engineers* expressed a similar concern: "If the United States cannot offer a final settlement in cases where a pattern and practice suit is proceeding simultaneously with a class action, then the Government's bargaining power will be severely reduced". 4 FEP Cases at 1093. Our worries are eased, however, as were those of the court in *Local No. 3, Operating Engineers*, by the Government's support of the broad class relief outlined in the opinion. As amicus curiae in this case, the EEOC has filed a post-argument brief arguing that "those who elect not to take under the consent decree, as well as those who are not covered by the decree, should have an opportunity to pursue vindication of their rights through this private litigation[33].

The case is reversed and remanded for proceedings consistent with this opinion.

---

33. Supplemental Brief for the United States Equal Employment Opportunity Commission as Amicus Curiae 4.