516 F.2d 1251
 11 Fair Empl.Prac.Cas. 98, 10 Empl. Prac.
Dec. P 10,360
Oliver I. SABALA, Individually and on behalf of all others
similarly situated, Plaintiff-Appellee-Cross-Appellant,
v.
WESTERN GILLETTE, INC., et al.,
Defendants-Appellants-Cross-Appellees.
Leonard M. RAMIREZ, Plaintiff-Appellee,
v.
WESTERN GILLETTE, INC., et al., Defendants-Appellants.
 No. 74-2711.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 4, 1975.
 
 G. William Baab, Dallas, Tex., for Southern Conference of Teamsters.
 A. J. Harper, II, Houston, Tex., Theodore W. Russell, Los Angeles, Cal., for Western Gillette.
 James P. Wolf, Houston, Tex., for Local Union 988.
 Henry M. Rosenblum, Houston, Tex., for Oliver I. Sabala.
 Sidney Ravkind, Houston, Tex., for Leonard M. Ramirez.
 Appeals from the United States District Court for the Southern District of Texas.
 Before WISDOM, SIMPSON and RONEY, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This Title VII Section 1981[1] employment discrimination class action[2] involves facially neutral seniority systems in a trucking company employing city drivers and road drivers.
 
 
 2
 Western Gillette, Inc., a nation-wide trucking company, employs Oliver Sabala, a Mexican-American, as a city driver at its Houston terminal. Sabala brings this action on behalf of all Mexican-Americans and blacks employed as city drivers at the Houston terminal. He attacks the separate seniority systems established for city and road drivers under the Company's collective bargaining agreement. Sabala contends that the facially neutral practices of maintaining separate lines of progression for road and city drivers, and of requiring city drivers to forfeit their job seniority to transfer from city to road jobs, effectively lock minority employees into the lower-paying city jobs. These practices, Sabala contends, perpetuate the effects of past racial discrimination in that they prevent minority drivers, historically relegated to the less desirable city jobs, from moving to the road. We have previously considered the discriminatory effect of these "ubiquitous practices in the trucking industry" in the Rodriguez trilogy.[3] See Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40; Herrera v. Yellow Freight System, Inc., 5 Cir. 1974, 505 F.2d 66; Resendis v. Lee Way Motor Freight, Inc., 5 Cir. 1974, 505 F.2d 69.
 
 
 3
 Sabala also contends that the Company has discouraged transfers, and thus prejudiced the plaintiff class, by overt acts of discrimination. Sabala alleges that he applied for a road job with Western Gillette in 1967 and was denied such employment because of his race. He was then offered the position of city driver, which he accepted. He has since made numerous unsuccessful attempts to transfer to the road. His complaint alleges that the Company's operations manager told him that he could not "hire your people for the road". Other class members testified that they had not been permitted to apply for road jobs.
 
 
 4
 The district judge, the Honorable John V. Singleton, Jr., found that the employment practices at the heart of this litigation were discriminatory and perpetuate the effects of past discrimination in violation of Title VII and Section 1981. He enjoined the defendants from continuing discriminatory practices, ordered changes in the seniority system, and awarded back pay and rightful place seniority relief to the individual discriminatees. The court also ordered that the defendants pay the plaintiffs' costs and attorney's fees. The defendants and the class plaintiffs appeal.
 
 
 5
 The judgment of the district court is affirmed in part, reversed in part, and remanded.
 
 I.
 
 6
 Sabala's suit against Western Gillette rests on Title VII and Section 1981; his suit against the three union defendants rests on Section 1981 exclusively.[4] He contends that the collective bargaining agreements creating separate seniority systems for road and city drivers together with the conditions imposed on transfer are so onerous as to make transfer virtually impossible. Although facially neutral, these practices discriminate in their purpose and effect.
 
 
 7
 Title VII requires that charging parties exhaust their administrative remedies before they sue in federal court. Although their right to sue is not conditioned on the EEOC's finding of reasonable cause to believe that discrimination has occurred, they may not circumvent the agency's processes. "(I)f charges of employment discrimination have not been filed against the unions, the appellants' right to file suit has not ripened." Miller v. International Paper Company, 5 Cir. 1969, 408 F.2d 283, 291. See also McDonnell Douglas Corp. v. Green, 1973, 411 U.S. 792, 798-99, 93 S.Ct. 1817, 36 L.Ed.2d 668. In their EEOC charges, the plaintiffs alleged only that Western Gillette was guilty of employment discrimination; they made no allegation of discrimination by the union. Following Miller, the district court found that it had jurisdiction over the Company, under 42 U.S.C. § 2000e, but that it did not have jurisdiction over the union defendants under that section.
 
 
 8
 The claim under Section 1981, on the other hand, is an independent cause of action. The Supreme Court has noted that "Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination." Alexander v. Gardner-Denver Company, 1974, 415 U.S. 36, 48-49, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147. The filing of EEOC charges is not a condition precedent to suit under Section 1981. See Alpha Portland Cement Company v. Reese, 5 Cir. 1975, 507 F.2d 607, 610. "Section 1981 and Title VII . . . provide for such radically different schemes of enforcement and differ so widely in their substantive scopes that using the policies behind the latter to create procedural barriers to actions under the former would stretch to the breaking point courts' customary duty to accommodate allegedly conflicting legislation." Macklin v. Spector Freight Systems, Inc., 1973, 156 U.S.App.D.C. 69, 478 F.2d 979, 996. The district court properly found that it had jurisdiction over the employer and the union defendants under Section 1981.
 
 
 9
 The trial of this cause was conducted in a bifurcated proceeding. The first part of the trial, which considered the issues of jurisdiction and liability, took place in October and November of 1972. Sabala v. Western Gillette, Inc., S.D.Tex.1973, 362 F.Supp. 1142. After the court found jurisdiction and liability, the trial court conducted a second hearing in November 1973 on issues pertinent to fashioning a remedy. Sabala v. Western Gillette, Inc., S.D.Tex.1974, 371 F.Supp. 385. The bifurcation of the cause anticipated the procedures recently suggested by this Court in Baxter v. Savannah Sugar Refining Corporation, 5 Cir. 1974, 495 F.2d 437.[5]
 
 
 10
 On the basis of testimonial and statistical evidence, the trial court concluded that the employer had discriminated in the past against the plaintiff class and that the present dual seniority system, as applied, perpetuates past discrimination by deterring minority employees from transferring to the road because of the necessary loss of their job seniority. The district court then considered whether the Company's present dual seniority system is justified by any business necessity. "When an employer or union has discriminated in the past and when its present policies renew or exaggerate discrminatory effects, those policies must yield, unless there is an overriding legitimate, nonracial business purpose." Local 189, United Papermakers and Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980, 989. See also Carey v. Greyhound Bus Co., 5 Cir. 1974, 500 F.2d 1372, 1376. The district court found no evidence in the record to suggest any legitimate nonracial business purpose that would justify the continued maintenance of dual seniority systems for road and city drivers at the Houston Terminal.[6] Moreover, it found that both Western Gillette and the defendant unions were responsible for this discrimination.
 
 
 11
 In fashioning a remedy the district court declined to require a complete merger of the two seniority systems on the ground that the relief would inequitably affect the seniority of various groups of Western Gillette employees. "There are established ways to eliminate the lock-in effect of separate seniority rosters without merging rosters and jeopardizing the seniority rights of those city drivers who remain in their positions." Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40, 61. The trial judge noted that such a complete merger of the seniority lines would have various shortcomings. "It would prejudice recently hired or transferred road drivers including minority drivers because they could be bumped off their job by city drivers with lower seniority on the city roster. Further, city employees who during the early years of their employment have enjoyed a weekly guarantee and consequent higher pay as compared to similarly situated road drivers would be permitted to move to the road with a resulting freeze of lower seniority men in the least attractive low-paying road jobs." Sabala v. Western Gillette, Inc., S.D.Tex.1974, 371 F.Supp. 385, 388. The trial judge ordered that all class members be afforded an opportunity to transfer to the road positions that had been denied them, either by outright discrimination or by virtue of having been locked into their city jobs because of the collective bargaining agreement. The court determined that relief should be sufficiently broad to insure that a transferring discriminatee would be able to keep his road job once he obtains it. The trial court ordered, therefore, that transferring discriminatees be given their "rightful place" seniority dates to facilitate the maintenance of their new positions. "A complete decree must give enough relief to insure that the transferred discriminatees are able to maintain their rightful place. Thus the rightful place theory dictates that we give the transferring discriminatee sufficient seniority carryover to permit the advancement he would have enjoyed, and to give him the protection against layoffs he would have had, in the absence of discrimination." Bing v. Roadway Express, Inc., 5 Cir. 1973, 485 F.2d 441, 450.
 
 
 12
 The trial court also provided for the award of back pay to city drivers who had been able and willing to transfer to the road, but were denied the opportunity to do so because of racial discrimination. The court did not require that the discriminatees offer proof that they had individually applied for road jobs that were in fact open.[7] Although an application requirement would be an easy device for establishing the identity of class members who should recover damages and for establishing an appropriate date for application of the rightful place doctrine, the equities of such a requirement are almost certainly illusory. It makes little sense to require of minority employees, retrospectively, formal application for transfer to positions that they reasonably knew to have been closed to their class.[8] Although a few city drivers may have had the courage, intransigence, or na ivete to apply for road jobs that were categorically and impermissibly beyond their reach, most would certainly not have bothered to make application in such circumstances. "If (a black) employee realizes full well that blacks are simply not hired as road drivers, why should he bother to apply?" Bing v. Roadway Express, Inc., 5 Cir. 1973, 485 F.2d 441, 451.
 
 
 13
 Judge Singleton held that no back pay should be computed for time after July 17, 1973, the date he had ordered that the discriminatory practices be terminated. He found that a road driver for Western Gillette expends 10 per cent of his gross annual pay on employment-related expenses and that such an amount should be deducted from back pay awards to discriminatees. With regard to deductions for "moonlight" earnings actually earned by the discriminatees (which they would not have been able to earn as road drivers), the court found the evidence inconclusive, retained jurisdiction to consider further evidence, and conditioned award of back pay to any discriminatee on his providing the court with sufficient information to make such a determination. Finally, the court provided that no discriminatee should receive back pay until Western Gillette had offered him a road job, which he had accepted, and which he had held beyond the 180-day retreat period. If the discriminatee were willing to waive the 180-day retreat period, then he would be able to receive his back pay award at the time of waiver.
 
 
 14
 The parties make numerous assignments of error on appeal. Western Gillette contends that the trial court erred in finding that the Company discriminated against the plaintiffs. The Company also argues that the court erred in assigning "rightful place" seniority dates for the purpose of fashioning affirmative relief. Western Gillette contends, too, that the trial court erred in not restricting the award of back pay to those members of the plaintiff class who in fact sought transfers to the road and were denied such transfers for discriminatory reasons. Next, the Company insists that the trial court erred in its method of calculation of back pay. Finally, Western Gillette contends that the trial court should have provided that the defendant unions in this action share in the burden of satisfying the back pay award to the plaintiffs.
 
 
 15
 The International Brotherhood of Teamsters and the Southern Conference contend that the trial court erred in assessing attorney's fees and costs against the defendant unions under Section 1981. They also contend that the trial court erred in basing the seniority relief accorded the plaintiff class on the Company's modified seniority system and Committee-ordered changes of operation.
 
 
 16
 Local 988 contends that the district court erred in finding that the local violated Section 1981 by delegating its bargaining authority to the National Committee and by signing the separate Road and City contracts negotiated by the National Committee and ratified by the national membership. The local suggests that it should not be liable under Section 1981 because it had no discriminatory intent. As proof of this fact, the local points to its 1970 recommendation to the National Committee that the separate seniority lines of road and city drivers should be merged.
 
 
 17
 Finally, Sabala contends that the trial court erred in its back pay calculation in that the court should have extended the defendants' liability for back pay until the date the discriminatees in fact achieved road driver status. Sabala also contends that the trial judge erred in limiting the award of attorney's fees to $35,000.
 
 II.
 
 18
 We must first determine whether the trial court erred in finding that Western Gillette discriminated against members of the plaintiff class by denying them the opportunity to transfer from city to road jobs. Western Gillette challenges the trial judge's findings on three grounds. First, the Company contends that no discrimination is shown in the record because there is no showing that jobs were available at the Houston Terminal during the period in question. Second, Western Gillette argues that the testimonial evidence does not establish overt discrimination. Finally, the Company contends that the statistical proof of discrimination adduced at trial is insufficient to support a finding of discrimination.
 
 A. JOB AVAILABILITY
 
 19
 The existence of a job vacancy, as Western Gillette correctly asserts, is logically necessary to a finding that a member of a disfavored class was denied employment because of impermissible discrimination. The Company contends that the business of its Houston Terminal has declined steadily and that no new road positions have become available during the period in question. The general decline of a business, with its concomitant effects on employment, of course, magnifies rather than lessens the need for strict compliance with the requirements of the federal civil rights acts. We have considered this problem previously in United States v. Jacksonville Terminal Company, 5 Cir. 1971, 451 F.2d 418. In Jacksonville Terminal, we held that the continued use of craft and class seniority systems to restrict the transfer and promotion of incumbent black employees at the declining Jacksonville railway terminal was neither bona fide nor a business necessity, and was in violation of Title VII requirements. "In any industry loss of seniority is a critical inhibition to transfer . . . At the Terminal, where total employment has decreased in recent years and preservation of seniority has become essential to economic survival, this transfer impediment is indeed monumental. It cannot survive Title VII's remedial impact." 451 F.2d 418, 453. In Jacksonville Terminal, we said that the government, or the discriminatees, must prove that whites received job assignments that were denied blacks, that the jobs were available when the blacks applied, and that blacks' qualifications were at least equal to those of the hired whites. 451 F.2d 418, 446.
 
 
 20
 Although Western Gillette contends that no jobs became available at Houston during the period in question, the trial judge found that a number of white "casuals"[9] had been able to "force-on" into regular road jobs and become new road drivers at the Houston Terminal. The trial court concluded that the ability of casuals to force-on into regular road jobs demonstrates that jobs were in fact available. The Company characterizes the Court's conclusion as seeking "to avoid the problem of the absence of job availability". We find no substance to that characterization.
 
 
 21
 A casual employee is one who is hired to work temporarily during the Company's periods of heavy volume traffic. Billy Lacy, a Western Gillette official, testified at trial:
 
 
 22
 "Well, we have several interline carriers that we do business with who bring us freight from over in the southeast Alabama, Georgia, Florida and they bring freight in and give it to us in Houston, which we take on west.
 
 
 23
 Sometimes we get a lot of freight from them when we weren't expecting very many loads. Sometimes we have we haul a lot of government ammunition or government commodities, whatever. Maybe some big shipper that we haven't done business with very often in the past will come up and say, 'Hey, I've got fifteen loads of freight that I'm going to have to move from here to Los Angeles in the next two weeks. Can you handle it?'
 
 
 24
 We say, 'Yes. We'll take it.'
 
 
 25
 Things of this nature cause us to use casuals."
 
 
 26
 Under the terms of the collective bargaining agreement, a driver who works as a casual driver is able to force himself into regular employment if, working as a casual, he is able to earn an average of $150 per week for four consecutive weeks. Whether a particular casual employee is able to earn an average of $150 per week for four consecutive weeks depends, of course, on whether the Company is willing to give an individual driver a sufficient number of trips to meet that figure. Instead of giving a large number of trips to one casual driver, the Company may give a smaller number of trips each to several drivers. In this way, the Company could prevent any individual driver from accumulating a sufficient number of trips to force on as a regular driver. Assuming good management, the Company need never hire a casual who will have forced on; it is entirely within the Company's power to prevent casuals from satisfying the necessary requirements for forcing on. This fact was brought out at trial when the trial judge asked Lacy: "if the terminal operator were on his toes and he had a casual working for him that he didn't like or didn't think was doing a good job, wasn't qualified, he would never let him get to the point where he forced himself on you, would he?" Lacy replied, "That's what I tell some of our terminal managers sometimes. That's true."
 
 
 27
 The evidence adduced at trial demonstrates that the power to exclude force-ons from permanent employment rests entirely with the Company. Western Gillette now contends that the successful forcing on of casual drivers at Houston demonstrates only that the terminal manager was inept in allocating work assignments to casual employees, and not that there were jobs available. The evidence, the Company suggests, establishes that no jobs were available as a matter of company judgment; all force-ons were simply the result of lax management by the Company's Houston administrative personnel. We find this argument unconvincing. Here, as elsewhere, contemporanoeus company practice speaks more truly than retrospective statements of company judgment. The Company had both the power and the business motivation to exclude force-ons from permanent employment if jobs did not exist. It did not choose to do so. We think, therefore, that the trial court's finding that jobs existed is reasonable.
 
 
 28
 As a final line of defense, Western Gillette contends that the presence of lax management and business conditions that resulted in the use of casuals do not establish any discriminatory intent on the part of Western Gillette. Discriminatory intent is not, of course, an essential element of an employment discrimination action. "Whether an employer is benevolent or malevolent in implementing its employment practices, the same prohibited result adheres if they are discriminatory; economic loss for the class of discriminatees." Baxter v. Savannah Sugar Refining Corporation, 5 Cir. 1974, 495 F.2d 437, 443. See also Johnson v. Goodyear Tire & Rubber Company, 5 Cir. 1974, 491 F.2d 1364. Moreover, we think that any inquiry into the possible existence of discriminatory intent is particularly irrelevant at this stage of analysis. The issue at hand concerns only the factual question whether employment opportunities existed at Western Gillette's Houston Terminal. The trial court found that the Company allowed casuals to force on as regular line drivers and that this company practice demonstrates the existence of jobs. These findings cannot be set aside as clearly erroneous. See Baxter v. Savannah Sugar Refining Corporation, 5 Cir. 1974, 495 F.2d 437, 445; Smith v. Delta Airlines, Inc., 5 Cir. 1973, 486 F.2d 512, 514.
 
 B. OVERT DISCRIMINATION
 
 29
 The plaintiffs do not allege that Western Gillette formally and categorically prevents transfers of its employees from city to road jobs.[10] Instead, they allege that Western Gillette discourages its city drivers, most of whom are black or Mexican American, from transferring to road jobs, both by acts of overt discrimination such as ignoring inquiries about possible transfer opportunities and by requiring transferees to divest themselves of their job seniority. See Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40, 48. The plaintiffs presented testimonial evidence to establish that the company overtly discriminated against individual members of the plaintiff class. The trial court found that testimony convincing and concluded that Western Gillette had discriminated against class members who wished to transfer. The Company now argues that the court's conclusion does not "square" with the testimony presented at trial.
 
 
 30
 We conclude that sufficient evidence of overt acts of discrimination was adduced at trial to allow the district court to find that the Company discriminated against members of the plaintiff class. Oliver Sabala, for instance, testified that he was working in 1967 for another trucking company, Big 3, when Western Gillette drivers told him that the latter company was in the process of hiring road drivers. Harper, Western Gillette's manager, told Sabala, whom he had known previously, that he was unable to offer Sabala a road job. Harper also told Sabala that he had plenty of work in the city and would be willing to hire him there. Sabala testified that Harper said, "If I do anything else, you'd get us both run off." According to Sabala, Harper also said, "(W)e don't hire your people on the road, and if I wanted to hire you, I couldn't."
 
 
 31
 Western Gillette now contends that Harper's alleged statements are ambiguous and probably mean only that Harper was unable to offer Sabala a road job because the Company did not have any road jobs available. When extracted from its natural context, Harper's language may indeed appear ambiguous. When set within the framework of the evidence as a whole, however, its meaning is clear. These statements are not the only evidence of overt discrimination.
 
 
 32
 Sabala testified that he accepted Harper's offer of employment with Western Gillette as a city driver, with the hope that he would be able to move to the more lucrative road job at some time in the future. After he accepted the city job, Sabala allegedly made numerous attempts to transfer to the road, but Western Gillette rebuffed those efforts.
 
 
 33
 Other members of the class also testified that their efforts to move from city to road jobs had failed. Alphonso Adams testified that he asked Western Gillette's Houston operations manager if he could move to the road and that he was told, in response, that he would have to quit his city job, lose his seniority, and start all over, as if he were a new employee. Frank Fountain testified that he asked the operations manager for an application to transfer to the road and was told that he would have to resign from the city to go to the road. The manager then told Fountain that he should not think about going out on the road because he would be laid off shortly after he had resigned his city job to go to the road. Although Western Gillette's counsel suggested to Fountain that the manager may have been trying to inform him of the dangers implicit in transfer, Fountain stated unequivocally that he understood that the manager was attempting to dissuade him because he did not want him to have the job. The manager's refusal to give Fountain an application, after Fountain said that he understood the implications of transfer, substantiates that interpretation.
 
 
 34
 Taking the evidence as a whole, we conclude that the trial court's finding of overt acts of discrimination is not clearly erroneous.
 
 C. STATISTICAL EVIDENCE
 
 35
 The trial court found that Western Gillette's employment statistics prove the existence of discrimination. The statistics show that no black or Mexican American has been hired by Western Gillette as a new road driver in the Southern Conference. Two blacks and a Mexican American currently work on the road for Western Gillette in the Southern Conference, but these three men all transferred to the Conference from road positions with the Company in other sections of the country.
 
 
 36
 At Houston, Western Gillette has 29 road drivers. One of these drivers is a Mexican American; none is a black. The racial composition of the city drivers at Houston is radically different. The eleven drivers who were hired in 1956 or before are all blacks. Fifty-four drivers have been hired since 1956. Twenty-three are white, twenty-five are black, and six are Mexican American. From these statistics, the trial court found that a pattern of discrimination against minority group road drivers exists at Western Gillette's Houston terminal.
 
 
 37
 A pattern of past discriminatory hiring is essential to the plaintiff's case. That pattern may be established by statistical evidence in conjunction with other evidence or by statistical evidence alone. Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40, 53. "The inference (of discrimination) arises from the statistics themselves and no other evidence is required to support the inference." United States v. Hayes International Corp., 5 Cir. 1972, 456 F.2d 112, 120.
 
 
 38
 Of the twenty-nine road drivers at Houston, only one belongs to a minority group. Of the sixty-five city drivers at Houston, forty-two are either blacks or Mexican Americans. The defendants argued in the trial court that these statistics do not show racial discrimination because the exclusion of minorities from road jobs was not total. The trial court properly rejected that line of reasoning.
 
 
 39
 The defendants now contend that the hiring statistics are irrelevant and that the transfer statistics, which show that some minority group members did transfer in the Southern Conference, are more relevant to the issues here. We must emphasize the specific focus of our inquiry here: whether the Company has had a policy of racial discrimination. Obviously, both sets of statistics are relevant to that inquiry. We think, nonetheless, that the hiring statistics may be better evidence of discrimination than are the transfer statistics.[11]
 
 
 40
 If the plaintiffs' theory is correct, the Company has used the loss of seniority transfer penalty to inhibit the movement of minority employees from city to road jobs. As more white city drivers have appeared on the scene, this penalty has obviously affected their transfer plans as well. The penalty, therefore, has become a blunt instrument of discrimination and has inhibited both white and minority city drivers in transferring from their city jobs. The result is that few city drivers of either race transfer to the road. From a purely statistical viewpoint, comparison of white and minority transfers is of limited utility because of the small size of the sample. If the design of the loss of seniority penalty is to prevent the transfer of city drivers to the road, it makes little sense to compare the numbers of white and minority city drivers who have transferred despite the loss of their seniority. The seniority loss penalty throws up a road-block to all city drivers in pursuit of road jobs and screens out some whites as well as minority personnel although, historically, most city drivers were black. The material distinction is, of course, that the white drivers could have applied for road jobs initially. We have noted this fact elsewhere:
 
 
 41
 Those white drivers who were employed as city drivers presumably had the opportunity to apply as road drivers but either were not qualified or preferred city work. Unlike . . . (the plaintiffs), the white drivers were not barred from the position of road driver by virtue of their race. Consequently, though the no-transfer policy may serve to keep all drivers in their present positions, the discriminatory hiring practices . . . colors the policy . . . with a distinctively discriminatory tint.
 
 
 42
 Bing v. Roadway Express, Inc., 5 Cir. 1971, 444 F.2d 687, 690.
 
 
 43
 The number of transfers was insignificant; most of the new road drivers are not transfers, but casuals who have been able to force on. They are all white. The statistical evidence is impressive.
 
 III.
 
 44
 Western Gillette next contends that the trial court erred in determining that the dual seniority system perpetuates past discrimination.
 
 
 45
 We think that the statistical evidence of discrimination and the testimonial evidence relating to Western Gillette's overt acts of discrimination, noted above and in the trial court's order, demonstrate the existence of past discrimination. Moreover, the evidence shows that the dual seniority system perpetuates past discrimination. Consequently, we find no merit to this contention.
 
 IV.
 
 46
 A modified seniority system is in effect at all Western Gillette's terminals in the Southern Conference. Under this modified seniority system, a road driver who is on layoff due to a reduction in force at his home terminal may "bump in" at another Western Gillette terminal in the Southern Conference and take job assignments there on the basis of his home terminal seniority. He will then displace any road driver with less seniority at the host terminal. The purpose and effect of this modified seniority system is to permit senior men to maintain the most lucrative jobs by giving them the mobility to reach those jobs when conditions are not favorable at their home terminals.
 
 
 47
 The trial court utilized the modified seniority system in its determination of rightful place seniority dates for the discriminatees at the Houston terminal.[12] The modified seniority system effectively extends the road driver's universe of job opportunities to the whole Southern Conference. As a result, the trial court believed it proper to make the available universe of relief coterminous with the universe of job opportunities from which the discriminatees were excluded because of discrimination.
 
 
 48
 Under Title VII, Congress has granted the courts plenary equitable power to fashion an appropriate remedy for employment discrimination. Pettway v. American Cast Iron Pipe Company, 5 Cir. 1974, 494 F.2d 211, 243. "Most courts, in molding appropriate remedies, have adhered to the 'rightful place' theory, according to which blacks are assured the first opportunity to move into the next vacancies in positions which they would have occupied but for wrongful discrimination and which they are qualified to fill." United States v. Georgia Power Company, 5 Cir. 1973, 474 F.2d 906, 927.
 
 
 49
 The trial court found that ten of the qualified class members would have accepted employment at any Western Gillette terminal in the Southern Conference. Thirteen class members would not have accepted employment anywhere but at the "declining" Houston facility. The trial court also found that road jobs were available both in Houston and elsewhere in the Southern Conference and that the discriminatees would have taken those jobs but for discrimination. Those discriminatees who wished to transfer from Houston to more lucrative positions elsewhere in the Conference would have been able to do so, absent discrimination, because of the modified seniority system in effect.
 
 
 50
 The trial court assigned rightful place seniority dates by distinguishing between those discriminatees who would have accepted employment anywhere in the Conference and those who would have accepted employment only at Houston. Those class members who would have accepted employment anywhere in the Southern Conference were assigned rightful place seniority dates based on the job next available anywhere in the Conference after the date on which a discriminatee was qualified to drive on the road. Those discriminatees who limited themselves to Houston employment were assigned seniority dates based on the job next available at Houston. See Sabala v. Western Gillette, Inc., S.D.Tex.1974, 371 F.Supp. 385, 388-89. In light of all the circumstances here, we think that this part of the relief ordered by the trial court was properly within its statutory discretion and conformed to its responsibility to frame an efficacious remedy.
 
 V.
 
 51
 The union defendants contend that the district court erred in finding them responsible, in part, for the discriminatory practices at the heart of this lawsuit. Local 988 is the collective bargaining agent for the discriminatees who bring this action. The membership of Local 988 delegated its bargaining authority to the National Bargaining Committee and ratified the contract that the National Bargaining Committee negotiated. The stimulus for the local's actions was the recognition that the National Bargaining Committee could negotiate a better contract with Western Gillette than could the local by itself. The result of these negotiations was a collective bargaining agreement that the district court found discriminatory in its effects.
 
 
 52
 Local 988 contends that the fact of its minority control, together with the fact that the local did not initiate or negotiate the contracts, remove this case from application of the "landmark decisions" of this Court. See Local 53, Insulators v. Vogler, 5 Cir. 1969, 407 F.2d 1047; Local 189, United Papermakers & Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980; United States v. Hayes International Corporation, 5 Cir. 1969, 415 F.2d 1038. Local 988 also notes that it actively petitioned the National Bargaining Committee to merge the separate seniority systems. Given the Local's informed decision to participate in the national bargaining negotiations despite discrimination, because of the tangible economic benefits a national contract promised to its members, we find the argument unpersuasive. See Baxter v. Savannah Sugar Refining Corporation, 5 Cir. 1974, 495 F.2d 437, 443.
 
 
 53
 The other union defendants were parties to the national bargaining negotiations and the architects of the seniority systems. See Johnson v. Goodyear Tire & Rubber Co., 5 Cir. 1974, 491 F.2d 1394.
 
 
 54
 In light of all the evidence, we hold that the district court's findings of union participation in discrimination were not clearly erroneous.
 
 VI.
 
 55
 Western Gillette contends that the district court should not have granted back pay relief to any class member who did not in fact make formal application for a road job and who was not discriminatorily denied such employment. This argument, of course, contains within it the expectation that no one would receive back pay because Western Gillette has created no new jobs at the Houston Terminal since May 1966. Hence, no one could be discriminatorily denied transfer, because the absence of a job is the best reason for denying employment. United States v. Jacksonville Terminal, 5 Cir. 1971, 451 F.2d 418, 446.
 
 
 56
 As we have noted previously, there are 29 road drivers at Houston. Seven of these drivers are casuals who have been able to force on. The Company contends that the employment of seven casuals who have forced on due to "lax management in peak periods of business stress" does not establish that a job was available or that the Company wished to fill a road position. A necessary element to a finding of job discrimination is that the alleged discriminatee be "qualified for a job for which the employer was seeking applicants". McDonnell-Douglas Corporation v. Green, 1973, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 668. We think, however, that the Supreme Court did not mean to suggest that a company could discriminate with impunity by filling available positions by other means, such as force-ons, rather than by entertaining applications. Western Gillette, as a business run for profit, could not rationally permit casuals to force on, and then continue, in non-existent jobs. We must conclude, with the district court, that new jobs did exist during this period.
 
 
 57
 Western Gillette chose to fill available jobs with casual employees whom the Company allowed to force on. At the same time, it refused to allow city drivers to carry over their job seniority to new positions if they transferred. We have held that this seniority penalty is unacceptable in that it perpetuates past discrimination. In these circumstances, we think that the district court properly awarded back pay without regard to whether an individual plaintiff actually made inquiries about the possibility of transfer to jobs (which the Company contends do not exist) on terms which we think impermissible. See Bing v. Roadway Express, Inc., 5 Cir. 1973, 485 F.2d 441, 451.
 
 
 58
 The trial court attempted to award back pay in an equitable manner, taking into consideration material differences among the individual discriminatees.[13] Western Gillette contends that the Court erred because one factor it thought immaterial was whether or not an individual applied for a job which the Company would tell him did not exist. The court acted reasonably. Part of the problem of fashioning back pay relief in this case springs from the Company's tenacity in maintaining that no new jobs existed while, at the same time, it continued to upgrade white casuals to permanent road jobs. If the chancellor's pen is less fine than the Company would choose, it is in part the result of the Company's obfuscatory tactics. In these circumstances, "it suffices for the trial court to determine the amount of back wages 'as a matter of just and reasonable inference'." Brennan v. City Stores, Inc., 5 Cir. 1973, 479 F.2d 235, 242.
 
 VII.
 
 59
 This Court has consistently held that back pay awards are not punitive. They are an integral part of the equitable relief to which discriminatees are entitled "to economically elevate (them) to the status which is rightfully theirs". Johnson v. Goodyear Tire & Rubber Co., 5 Cir. 1974,491 F.2d 1364, 1376. See also United States v. Georgia Power Co., 5 Cir. 1973, 474 F.2d 906, 921; Carey v. Greyhound Bus Co., 5 Cir. 1974, 500 F.2d 1372, 1378. In determining the amount of back pay to which the discriminatee would be entitled, the trial judge carefully considered numerous formulae that the parties presented for his consideration. Indeed, the trial court noted that the "variety of formulae by which individual back pay due this class of discriminatees can be computed is bewildering". Sabala v. Western Gillette, S.D.Tex.1974, 371 F.Supp. 385, 392.
 
 
 60
 The trial judge computed back pay awards in the following manner. First, he selected a reasonably prudent (i. e. representative) road driver and a reasonably prudent city driver, each having characteristics representative of their peers with respect to seniority, earnings and work habits. Next, he compared the average monthly earnings of these representative drivers for the period June 3, 1968 to July 17, 1973. The trial court there found that an average road driver, on a monthly basis, earns 1.56 times the amount earned by an average city driver. The trial judge acknowledged that this method of damage calculation contains a statistical disparity and does not measure what the plaintiffs would have earned if they had been given the first available opportunity to transfer. The trial court, nonetheless, thought this formula was the best available method of estimating the back pay to be awarded.
 
 
 61
 The court then computed the discriminatee's earnings for the period from June 3, 1968 to July 17, 1973, or from his "rightful place" seniority date to July 17, 1973, whichever period was the lesser. That figure was then multiplied by a factor of 1.56, reduced by 10 percent to account for employment-related expenses, and further reduced by the amount of any "interim earnings" that the discriminatee had been able to earn while working as a city driver, which he would not have been able to earn if he had been on the road.
 
 
 62
 The inherent difficulties in computing back pay require that the district courts be allowed broad discretion:
 
 
 63
 The method of calculating a class-wide back pay award must not be rigid. This results from the impossibility of calculating the precise amount of back pay. There is no way of determining which jobs the class members would have bid on and have obtained if discriminatory testing, seniority, posting and bidding system, and apprentice and on-the-job training programs had not been in existence. Class members outnumber promotion vacancies; jobs have become available only over a period of time; the vacancies enjoy different pay rates; and a determination of who was entitled to the vacancy would have to be determined on a judgment of seniority and ability at that time. This process creates a quagmire of hypothetical judgments.
 
 
 64
 Pettway v. American Cast Iron Pipe Co., 5 Cir. 1974, 494 F.2d 211, 260 (emphasis added).
 
 
 65
 In Pettway, Judge Tuttle recognized that there were several possible methods for computing back pay, and that the choice of method was essentially a question for the trial court, subject to our correction if the trial court's method was so unreasonable as to amount to an abuse of discretion. As Judge Tuttle suggested, the proper method of computation of back pay depends on the complexity of the case. "It should be emphasized that this is not a choice between one approach more precise that another. Any method is simply a process of conjectures . . . (E)xact reconstruction of each individual claimant's work history, as if discrimination had not occurred, is not only imprecise but impractical." 494 F.2d 211, 261-62.
 
 
 66
 In the circumstances of this case, we think that the method chosen by the district court to determine back pay was not unreasonable. We find no abuse of discretion by the trial court.
 
 VIII.
 
 67
 The plaintiffs also contend that the district court erred in framing back pay relief. The discriminatees argue that the court should have extended back pay relief to the date that each individual discriminatee achieved road driver status. Instead, the court allowed back pay relief only until July 17, 1973, the date of its first order. At the same time, the trial court conditioned payment of the back pay awards on the offer and acceptance of road jobs in individual cases. Although logic may suggest that these two dates should coincide, we do not think that that result is required as a matter of law. We think that a court of equity, in framing its relief, is at liberty to do what the district court has ordered here.
 
 
 68
 Judge Tuttle has stated the relevant standard of review in back pay award cases: "Because of the compensatory nature of a back pay award and because of the 'rightful place' theory, adopted by the courts, and of the strong congressional policy, embodied in Title VII, for remedying employment discrimination, the scope of a court's discretion to deny back pay is narrow." Pettway v. American Cast Iron Pipe Company, 5 Cir. 1974, 494 F.2d 211, 252 (emphasis added). In Pettway, the court ordered injunctive relief to aid the discriminatees in gaining and maintaining their rightful place. 494 F.2d 211, 248. Although we ordered the district court to require the company to take affirmative steps to insure that the discriminatees be given their rightful place, we did not require the district court to award back pay to the date they would actually take their rightful place. "The termination date of the back pay period for most claimants will be the date of the district court's decree implementing our decision, but may, depending on the employee's situation, be March 31, 1971, the date testing was ended." 494 F.2d 211, 258 (emphasis added).
 
 
 69
 The termination date in the present case was relatively earlier than in Pettway in that the district court used the date of its initial decree as the termination date. In the context of the particular relief ordered by the district court, the selection of that termination date was not unreasonable. We note that the trial court retained jurisdiction, although only for a period of one year, to evaluate the company's efforts in remedying the discrimination and to order further relief, if necessary. That year is now over. We are of the view, therefore, that the district court should retain jurisdiction for such further time as may be necessary to carry out that relief.
 
 
 70
 Several problems face the trial court. As the date of its original order recedes further into the past, injury to those plaintiffs who have not yet been offered road jobs will, of course, increase and be compounded. At the same time, the possibility exists that proper regard for the Company's business efficiency will not permit Western Gillette to offer road jobs to all the discriminatees during that same period. The trial court must be sensitive to the needs of the discriminatees, but it must be equally vigilant in avoiding results that interfere with the company's legitimate business decisions. In these circumstances, it is the task of the trial court to balance relevant considerations and do equity. The relief granted by the trial court, limited as it was, was designed to effect this nice balance of interests.
 
 
 71
 At the same time, the district court's retention of jurisdiction demonstrates that it recognizes that further relief may be required if the company does not conform its conduct to the spirit as well as the letter of the district court's decree. On remand, the district court may, if necessary, reconsider the back pay relief granted in light of the company's ability to date to find jobs for the discriminatees. We do not, however, find any abuse of discretion in the court's failure to grant back pay to the date of achieving road driver status on the record facts.
 
 IX.
 
 72
 The trial court found that the company and the three union defendants shared responsibility for the discriminatory practices at the heart of this dispute. Consequently, it ordered that attorney's fees should be paid by all the defendants, the company paying one-half the amount and the unions sharing liability for the other half. Without setting forth any reasons, however, it awarded the full amount of back pay liability against the company alone.
 
 
 73
 On appeal, Western Gillette contends that the trial court failed to make the unions liable for back pay because it erroneously thought that it lacked the power to do so. The trial court did not have the benefit of our decision in Johnson v. Goodyear Tire & Rubber Co., 5 Cir. 1974, 491 F.2d 1364. In Johnson, we held that the district court properly awarded back pay relief against the defendant union. We said:
 
 
 74
 Common sense demands that a union be held to the natural consequences of its labors in negotiating a collective bargaining agreement.
 
 
 75
 Guided by the facts of this case it would be difficult to fasten liability on one party to the labor contract which was a substantial cause of the discriminatory employment practices and grant total immunity from such liability to the other party. The union was more than a passive participant in the contractual arrangements which furnished a substantial contribution to the discriminatory results evident here.
 
 
 76
 Johnson, 491 F.2d 1364, 1381-82.
 
 
 77
 For its part, the union points out that the trial court was made aware of the possibility of allocating back pay relief among the defendants at an early stage of the case. During its consideration of the jurisdiction issue, at the beginning of the lawsuit, the court asked counsel several questions concerning the differences between Title VII and Section 1981 cases. The following colloquy took place:
 
 
 78
 The Court: Well, there's a Fifth Circuit opinion I don't know whether I have it out here or not holding that if no complaint was filed against the union, that they are not amenable to a Title VII case.
 
 
 79
 Mr. Rosenblum: Well, of course, adequate relief of the nature which we seek can be afforded under 1981.
 
 
 80
 The Court: We can't grant injunctive relief under 1981, can we? I don't know. I'm asking.
 
 
 81
 Mr. Rosenblum: I think you can, Your Honor, yes.
 
 
 82
 The Court: As well as damages?
 
 
 83
 Mr. Rosenblum: As well as damages and I don't think that the disparity of relief available under 2000(e) (§ 2000e) and 1981 is that
 
 
 84
 The Court: Is that different?
 
 
 85
 Mr. Rosenblum: that controlling that it would limit their presence here.
 
 
 86
 This colloquy is not sufficient to resolve the ambiguity in the district court's order.
 
 
 87
 On remand, the court should reconsider its award of back pay in light of Johnson v. Goodyear Tire & Rubber Co., 5 Cir. 1974, 491 F.2d 1364. The trial court should also state reasons for its decision.
 
 X.
 
 88
 The district court awarded counsel for the plaintiff class $35,000 in attorneys' fees.[14] The court found that Western Gillette was liable for one-half the amount of the attorneys' fees while the three union defendants were each liable for one-third of the remaining one-half. The principle applied by the district court is that "(t)he question of attorneys' fees involves an allocation of responsibility for this discrimination among the various defendants". Sabala v. Western Gillette, Inc., S.D.Tex.1973, 362 F.Supp. 1142, 1155. Because the cause of action against the union defendants was grounded solely on Section 1981, the district judge's allocation of attorneys' fees among all the defendants may have been improper in light of the Supreme Court's recent decision in Alyeska Pipeline Service Company v. Wilderness Society, 1975, --- U.S. ---, 95 S.Ct. 1612, 44 L.Ed.2d 141.
 
 
 89
 The district court may have allocated its award of attorneys' fees among the four defendants because it mistakenly believed that Title VII and Section 1981 equally confer the power to award attorneys' fees. "The 1964 Civil Rights Act provides that the court, in its discretion, may allow the prevailing party reasonable attorneys' fees as part of the costs . . . The Fifth Circuit has held that in a § 1981 action the court may also award attorneys' fees." Sabala v. Western Gillette, Inc., S.D.Tex.1973, 362 F.Supp. 1142, 1155. Thus, the district court allocated liability for the attorneys' fees award among the defendants despite its finding that "the primary responsibility for the discrimination against the class is the Company's". Id., 362 F.Supp. 1142, 1155.
 
 
 90
 In Alyeska, the Supreme Court held that attorneys' fees may not be granted against a losing party except by specific congressional authority or under one of the long-standing judicially fashioned exceptions[15] to the general rule, such as where the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons". 95 S.Ct. 1612, 1622. The Supreme Court noted that the Court of Appeals in Alyeska had expressly disclaimed reliance on any of the traditional exceptions to the general rule. Explaining the relationship between the judicially fashioned exceptions and the primary responsibility of Congress the Court said:
 
 
 91
 Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorney fees; but neither has it retracted, repealed or modified the limitations on taxable fees contained in the 1853 statute and its successors. Nor has it extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted. What Congress has done, however, while fully recognizing and accepting the general rule, it itself to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights.
 
 
 92
 95 S.Ct. 1612, 1623.
 
 
 93
 The Supreme Court suggested that Congress has the power and judgment to pick and choose among its statutes and to allow attorney's fees under some statutes but not others. The courts, presumably, are not able to do so in the absence of legislative guidance. Consequently, the courts may award attorneys' fees only if explicitly authorized by statute or by one of the traditional exceptions to the general rule. Congress has explicitly authorized the award of attorneys' fees in Title VII litigation. See 42 U.S.C. § 2000e-5(k). Congress has not categorically authorized the award of attorneys' fees in Section 1981 cases. Section 1981 plaintiffs must depend on one of the traditional exceptions to the general rule if they are to recover attorneys' fees.
 
 
 94
 The trial judge found authority for awarding attorneys' fees under Section 1981 in Jinks v. Mays, 5 Cir. 1972, 464 F.2d 1223. In Jinks, we held that "(f)ederal district courts may, in their discretion, award attorneys' fees in civil rights litigation where the actions of the defendants were 'unreasonable and obdurately obstinate'. Horton v. Lawrence County Board of Education, 449 F.2d 793 (5th Cir. 1971); Lee v. Southern Home Sites Corp., 429 F.2d 290 (5th Cir. 1970) and Williams v. Kimbrough, 415 F.2d 874 (5th Cir. 1969)." Jinks, 5 Cir. 1972, 464 F.2d 1223, 1228. The Supreme Court explicitly recognized the Jinks exception to the general rule against the award of attorneys' fees in Alyeska:
 
 
 95
 This Court's summary affirmance of the decision in Sims v. Amos, 340 F.Supp. 691 (M.D.Ala.), aff'd, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972), cannot be taken as an acceptance of a judicially created private attorney general rule. The District Court in Sims indicated that there was an alternative ground available the bad faith of the defendants upon which to base the award of fees. 340 F.Supp., at 694. See also Edelman v. Jordan, 415 U.S. 651, 670-671, 94 S.Ct. 1347, 1359-1360, 39 L.Ed.2d 662 (1974).
 
 
 96
 Alyeska Pipeline Co. v. Wilderness Society, 1975, --- U.S. ---, 95 S.Ct. 1612, 1628, n. 46, 44 L.Ed.2d 141.
 
 
 97
 The language of the district judge's opinion is ambiguous, however, as to whether he construed Jinks to allow an award of attorneys' fees in all Section 1981 cases or only where the defendants acted in bad faith.
 
 
 98
 On remand, therefore, the district judge should determine whether the union defendants are liable for attorneys' fees under one of the exceptions to the general rule.
 
 XI.
 
 99
 The plaintiffs contend that the court's award of $35,000 in attorneys' fees to the attorneys for the class was inadequate in amount. The trial court based its award on a finding "that the amounts . . . are reasonable under the circumstances in light of the time spent in preparation and litigation of the cause, the complexity of such preparation and litigation, and the novelty of the issues." Sabala v. Western Gillette, Inc., S.D.Tex.1974, 371 F.Supp. 385, 394.
 
 
 100
 Without expressing any opinion on the ultimate issue of the adequacy of the attorneys' fees awarded, the conclusory language of the trial judge's order effectively prevents any meaningful review of the award made. "The fixing of attorney's fee must be left to the discretion of the trial judge, but the failure below to state the premise for limiting the award gives us no basis to determine whether that discretion was properly exercised." Mims v. Wilson, 5 Cir. 1975, 514 F.2d 106.
 
 
 101
 On remand, the district court should provide a statement of reasons supporting the amount of this award and, if necessary, take further evidence on the issue.
 
 
 102
 The judgment of the district court is affirmed in part, reversed in part, and remanded.
 
 
 
 [1]
 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981
 
 
 [2]
 Initially, two suits were brought and consolidated in the district court. Oliver Sabala brought suit individually and on behalf of all others similarly situated in Sabala v. Western Gillette, # 71-H-961. Leonard Ramirez brought suit individually in Ramirez v. Western Gillette, # 71-H-1338. The issues are substantially the same on appeal, and Ramirez has filed no brief in this Court. References to Sabala hereafter will be used to designate the appellees
 
 
 [3]
 We have previously noted the effect of these practices in the trucking industry:
 As the federal courts have thus become familiar with the practices in the trucking industry, a clear pattern has emerged: throughout much of the industry, trucking companies, and the unions representing drivers, have erected barriers to the movement of non-white/non-Anglo workers from pick-up and delivery jobs to the coveted road driver positions. The employment practices attacked in this suit the no-transfer and seniority policies are prevalent in the trucking industry. Typically, city drivers are not permitted to transfer to line driver jobs. Where they are, they are not generally permitted to carry over their seniority for job bidding and lay off purposes. The result is, at the very least, a strong disincentive for city drivers to transfer to the road. City drivers are thus effectively "locked in" their city driving jobs with no realistic possibility of transferring to line driving positions. Were there no more to the scenario, of course, the federal courts would likely have no concern; there is nothing per se illegal in no-transfer or separate seniority policies. But, as the courts have noted with some frequency, the policies often operate to perpetuate the effects of hiring discrimination. The overall result is a situation where in many areas of the country blacks and Mexican-Americans serve as city drivers, while road-driver fleets in private trucking firms, at least until very recently, have been virtually all-white/Anglo.
 Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40, 53. See also Bing v. Roadway Express, Inc., 5 Cir. 1971, 444 F.2d 687. Leone, The Negro in the Trucking Industry, U.Pa. (Wharton School Industrial Research Unit), Rep. 15-1970; Nelson, Equal Opportunity in Trucking: An Industry at the Crossroads, E.E.O.C. # EEO 72001 (1971).
 
 
 [4]
 Sabala's complaint states two separate theories of recovery. First, Sabala alleges that the defendants, International Brotherhood of Teamsters, Southern Conference of Teamsters, and Local 988, violated their duties of fair representation under 29 U.S.C. § 151 because they knowingly acquiesced, joined, or conspired with the company, in the alleged discriminatory practices. The complaint also alleges that they have neglected to take any affirmative steps toward protecting Mexican American and black employees from those practices. The district court found that none of the union defendants breached its statutory duty of fair representation. Sabala v. Western Gillette, S.D.Tex.1973, 362 F.Supp. 1142, 1156. The plaintiffs do not appeal from that finding and we need not consider that issue here
 
 
 [5]
 In Baxter, Judge Gewin wrote:
 "A Title VII class action suit presents a bifurcated burden of proof problem. Initially, it is incumbent on the class to establish that an employer's employment practices have resulted in cognizable deprivations to it as a class. At that juncture of the litigation, it is unnecessarily complicating and cumbersome to compel any particular discriminatee to prove class coverage by showing personal monetary loss. What is necessary to establish liability is evidence that the class of black employees has suffered from the policies and practices of the particular employer. Assuming that the class does establish invidious treatment, the court should then properly proceed to resolve whether a particular employee is in fact a member of the covered class, has suffered financial loss, and thus entitled to back pay or other appropriate relief."
 495 F.2d 437, 443-44.
 
 
 [6]
 See Rodriguez v. East Texas Motor Freight, 5 Cir. 1975, 505 F.2d 40, 56-59
 
 
 [7]
 In Johnson v. Goodyear Tire & Rubber Co., 5 Cir. 1974, 491 F.2d 1364, we said:
 "(T)he initial burden is now placed on the individual labor department employee to show that he is a member of the recognized class subject to employment discrimination, . . .. Unquestionably, it is now impossible for an individual discriminatee to recreate the past with exactitude . . . If an (individual) employee can show that he was hired into the labor department . . . and was subsequently frozen into that department because of the discriminatory employment practices established here, thus we think the individual discriminatee has met his initial burden of proof . . . It will be incumbent upon Goodyear to show by convincing evidence that other factors would have prevented his transfer regardless of the discriminatory employment practices . . . Any doubts in proof should be resolved in favor of the discriminatee giving full and adequate consideration to applicable equitable principles."
 491 F.2d 1364, 1379-80. See also Pettway v. American Cast Iron Pipe Company, 5 Cir. 1974, 494 F.2d 211, 259.
 
 
 [8]
 In the present case, the company has steadfastly maintained that road jobs do not exist while, at the same time, it has allowed white "casuals" to gain road employment by forcing on into those jobs. This fact, in concert with the impediments to transfer found in the overt discrimination and loss of seniority penalty established in the district court, would make formal application appear to be a futile act
 
 
 [9]
 Casual drivers have no seniority. They are not required to work for only one company, but may take jobs with a number of companies located in their areas
 
 
 [10]
 An absolute bar to transfer is not, of course, required to demonstrate that members of the plaintiff class have been locked in positions that they hold because of past discrimination. We considered similar circumstances in Rodriguez :
 The conclusion is inescapable that both the no-transfer policy and the maintenance of dual seniority rosters . . . have perpetuated ETMF's past discriminatory hiring practices. Together, they have removed all realistic opportunity for transfer. Under the no-transfer policy a city driver wishing to transfer to road status must first resign his city driver position, with no assurance that he will be hired as a line driver, and no assurance that if he fails to be hired he will be rehired as a city driver. Even if the city driver were to become a road driver, because of the separate seniority rosters he would lose his accumulated competitive-status seniority. He would have the last choice of routes and would be the first laid off. And if laid off he would have no "bumping" rights to recover his city driver job . . . It is no surprise, then, that when the company temporarily relaxed in 1972 its no-transfer policy and its requirement that road drivers have three years line haul experience only five ETMF city drivers in the entire Southern Conference area took, qualified for, and held the road driver job. For a city driver with a significant amount of seniority the choice must have been a difficult one indeed. The named plaintiffs testified that they were unwilling to give up their city driving seniority to transfer to road driving jobs they otherwise desired. In the strictest sense, city drivers were "locked" into city driving jobs. The discrimination that removed the possibility that a Mexican-American or Negro could obtain a line driver job when first applying to the company was thus continued and perpetuated by the no-transfer and seniority policies which prevented the city drivers from later transferring to road driver jobs.
 Rodriguez v. East Texas Motor Freight, 5 Cir. 1974, 505 F.2d 40, 56 (emphasis added).
 
 
 [11]
 The defendant's argument is that the transfer statistics demonstrate that some minority employees, despite overt discrimination and the loss of their seniority, have been willing to transfer. Since these artificial barriers to transfer are themselves discriminatory, the fact that some class members have been willing to take their chances and transfer despite the overt hostility of company officials and the loss of job seniority is insignificant. No allegation has been made that the company has absolutely and categorically barred transfer. The discrimination it has practiced is more subtle than that. Consequently, the company's reasoning is circular and the point it makes is trivial
 
 
 [12]
 See Local 189, United Papermakers & Paperworkers v. United States, 5 Cir. 1969, 416 F.2d 980, 988
 
 
 [13]
 In making an award of back pay, considerable difficulty stems from the court's unavoidable problem of interpreting the significance of silence on the part of discriminatees. On the one hand, it may indicate disinterest. On the other hand, it may indicate a sense of futility. Moreover, only the most ingenuous would fail to note that the possibility of a large back pay award may stimulate retrospective interest where none initially existed. In these circumstances, the trial judge must be accorded wide discretion in determining criteria for the award of back pay. "The rationale in Bing was that silence might be caused by a belief in the futility of a transfer request. That may be true, but also it may be caused by no desire to transfer. The District Judge is in the best position to determine this issue." Thornton v. East Texas Motor Freight, 6 Cir. 1974, 497 F.2d 416, 421
 
 
 [14]
 The trial court also awarded Ramirez's counsel $12,500 in attorneys' fees. That sum is not contested here
 
 
 [15]
 Justice Marshall, in dissent, noted a logical inconsistency in the court's analysis. If courts have traditionally had the equitable power to carve out exceptions to the general rule, why has that power now expired so that the courts may now utilize the traditional exceptions but may not add new exceptions? Justice Marshall said:
 In my view, these cases simply cannot be squared with the majority's suggestion that the availability of attorneys' fees is entirely a matter of statutory authority. The cases plainly establish an independent basis for equity courts to grant attorneys' fees under several rather generous rubrics. The Court acknowledges as much when it says that we have independent authority to award fees in cases of bad faith or as a means of taxing costs to special beneficiaries. But I am at a loss to understand how it can also say that this independent judicial power succumbs to Procrustean statutory restrictions indeed, to statutory silence as soon as the far from bright line between "common benefit" and "public benefit" is crossed. I can only conclude that the Court is willing to tolerate the "equitable" exceptions to its analysis not because they can be squared with it but because they are by now too well established to be casually dispensed with.
 Alyeska Pipeline Company v. Wilderness Society, 1975, --- U.S. ---, 95 S.Ct. 1631-32, 44 L.Ed.2d 141 (emphasis added).